# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | |
|---|---|
| JEFFREY COLEMAN,<br>    **Plaintiff** | )<br>)<br>)  **REPORT AND** |
| | )  **RECOMMENDATION** |
| v. | )<br>)  **Case No. 7:11cv00518** |
| JOHN JABE, et al.,<br>    **Defendants.**[1] | )<br>)  By: Pamela Meade Sargent<br>)  United States Magistrate Judge |

Plaintiff, Jeffrey Coleman, an inmate formerly incarcerated[2] at Pocahontas State Correctional Center, ("Pocahontas"), in Pocahontas, Virginia, filed this action pro se for monetary damages, injunctive relief and declaratory relief under 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act, ("RLUIPA"), 42 U.S.C. §§ 2000cc *et seq.*, against the Virginia Department of Corrections, ("VDOC"), and various VDOC officials. All of the actions giving rise to Coleman's claims occurred while he was incarcerated at Pocahontas. Jurisdiction over this matter is based upon 28 U.S.C. §§ 1331 and 1343. The matter is before the undersigned on the defendants' Motion For Summary Judgment, (Docket Item No. 37), ("Motion"). This case is before the undersigned

---

[1] The remaining defendants in this case are: (1) the VDOC; (2) John Jabe, former Deputy Director of the VDOC; (3) Harold Clarke, current Director of the VDOC; (4) Lou Cei, Special Programs Manager and Chair of the Faith Review Committee for the VDOC; (5) Stanley Young, Warden at Pocahontas State Correctional Center; (6) K.S. Richardson, contract Chaplain at Pocahontas; (7) Dave Hammond, a Treatment Program Supervisor at Pocahontas; (8) Robert Bivens, a Regional Ombudsman for the Western Region; (9) Catherine Turner, the Grievance Coordinator at Pocahontas; and (10) unknown members of the Faith Review Committee.

[2] Coleman notified the court on July 26, 2012, that he is now housed at Augusta Correctional Center in Craigsville, Virginia.

Case 7:11-cv-00518-SGW-PMS   Document 57   Filed 12/26/12   Page 1 of 84   Pageid#: 707

magistrate judge by referral, pursuant to 28 U.S.C. § 636(b)(1)(B). The plaintiff has responded to the Motion, and neither party has requested a hearing on the Motion. Based upon the parties' briefs and the accompanying affidavits and exhibits, I recommend that the court grant the Motion in part and deny the Motion in part.

Coleman filed his Complaint, which he later amended by court order, pursuant to 42 U.S.C. § 1983, alleging a violation of his constitutional rights under the First Amendment, the Eighth Amendment and the Fourteenth Amendment and RLUIPA. Coleman's Amended Complaint[3] contains the following 14 claims:[4] (1) the VDOC policy restricting his purchase of religious spoken word CDs to a single vendor violates his rights to free speech and to freely exercise his religion, the Establishment Clause, the Privileges and Immunities Clause and RLUIPA; (2) the VDOC policy restricting the purchase of religious prayer oil to a single vendor and limiting such purchase to one, one-ounce bottle per week violates his right to freely exercise his religion, the Privileges and Immunities Clause and RLUIPA; (3) the VDOC grooming policy preventing him from growing a beard violates his right to freely exercise his religion, constitutes cruel and unusual punishment, and violates the Privileges and Immunities Clause and RLUIPA; (4) the VDOC dress code prohibiting him from wearing his pants above his ankles violates his right to freely exercise his religion, his right to equal protection, the Privileges and Immunities Clause and RLUIPA; (5) the failure to provide a Halal-certified diet including Halal meat violates his right to freely exercise his religion, his right to equal protection, the Privileges and Immunities Clause, the Eighth Amendment and

_____

[3] The court allowed Coleman to amend his Amended Complaint by Order dated May 25, 2012. (Docket Item No. 47).

[4] This summary of the Coleman's claims is largely pulled from the Motion.

-2-

RLUIPA; (6) the prohibition of prayer in the pod violates his right to freely exercise his religion, violates his right to equal protection and violates RLUIPA; (7) the expenditure of state and federal money supporting Protestant chaplains violates the Establishment Clause; (8) Chaplain Richardson: (a) refuses to provide internet articles for Muslim inmates while doing so for inmates of other religions; (b) acquires religious items for some religions but not others; and (c) violated the Eid-ul-Adha prayer by scheduling it in a place with pictures; plaintiff alleges these actions violate his right to freely exercise his religion, his right to equal protection and RLUIPA; (9) the refusal by Louis Cei and the Faith Review Committee, ("FRC"), to recognize the Salafi sect of Islam as a separate group from that of the Sunni sect of Islam violates his right to freely exercise his religion, the Establishment Clause and RLUIPA; (10) Defendants Turner and Bivens interfered with his rights to grieve the issues contained herein and retaliated against him for filing grievances against Chaplain Richardson; (11) the expenditure of state and federal money for the purchase of Islamic materials violates the Establishment Clause; (12) the failure of Cei and the FRC to authorize the Fast of Ashura as a Muslim holy day and order Pocahontas to accommodate it violated his right to freely exercise his religion under the First Amendment and RLUIPA; (13) Defendants Hammond and Young improperly overcharged him for photocopies, violating his right to equal protection and constituting retaliation; and (14) Defendant Hammond retaliated against him by failing to hire him for a law library job.

## I.     Analysis

With regard to a motion for summary judgment, the standard for review is well-settled.  The court should grant summary judgment only when the pleadings,

responses to discovery and the record reveal that "there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a); *see, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). A genuine issue of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

In considering a motion for summary judgment, the court must view the facts and the reasonable inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *See Anderson*, 477 U.S. at 255; *Matsushita*, 475 U.S. at 587. Thus, the court will view the facts and inferences in the light most favorable to Coleman on the defendants' Motion. In order to be successful on a motion for summary judgment, a moving party "must show that there is an absence of evidence to support the non-moving party's case" or that "the evidence is so one-sided that one party must prevail as a matter of law." *Lexington-South Elkhorn Water Dist. v. City of Wilmore, Ky.*, 93 F.3d 230, 233 (6th Cir. 1996).

### 1. Absolute Immunity

As an initial matter, the Fourth Circuit has held that RLUIPA does not authorize damages against an official in his or her official capacity. *See Madison v. Virginia*, 474 F.3d 118 (4th Cir. 2006). Thus, to the extent that Coleman seeks such a remedy, the claims against the defendants in their official capacities must be dismissed. Moreover, the Fourth Circuit held in the case of *Rendelman v. Rouse*, 569 F.3d 182 (4th Cir. 2009), that if jurisdiction under RLUIPA is based on the

-4-

Spending Clause, RLUIPA does not authorize a claim for money damages against officials in their individual capacities. The court in *Rendelman* recognized that Congress had the right to enact RLUIPA under the Spending Clause to control the actions of state and local entities and officials who receive federal funding. *See* 569 F.3d at 187-89. The court further noted that RLUIPA itself recognizes that Congress also has the authority to act when actions at issue affect interstate commerce. *See Rendelman*, 569 F.3d at 189 (citing 42 U.S.C. § 2000cc-1(b)). The *Rendelman* court emphasized that when Congress desires to impose a condition under the Spending Clause, "it is Congress' burden to 'affirmatively impos[e]' [the] 'condition in clear and unmistakable statutory terms.'" 569 F.3d at 189 (quoting *Va. Dep't of Educ. v. Riley*, 106 F.3d 559, 563 (4th Cir. 1997) (en banc) as quoted in *Madison*, 474 F.3d at 125)). The Fourth Circuit in *Rendelman* held that "in simply defining 'government' in § 2000cc-2 to include a 'person acting under color of State law,' Congress did not signal with sufficient clarity an intent to subject such a person to an individual capacity damages claim under RLUIPA." 569 F.3d at 189 (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). Thus, Coleman cannot rely on RLUIPA's Spending Clause basis to pursue a claim for individual capacity damages.

The question of "whether RLUIPA analyzed under the Commerce Clause, would authorize individual capacity damage actions remains unsettled in the Fourth Circuit." *Shabazz v. Va. Dep't of Corrs.*, 2012 WL 463562, at *10 (E.D. Va. Feb. 13, 2012) (quoting *Rendelman*, 569 F.3d at 189); *see also Abdul-Mateen v. Phipps*, 2012 WL 601430, at *3 n.4 (W.D. Va. Feb. 23, 2012) (noting that neither the Fourth Circuit nor the United States Supreme Court has addressed whether a RLUIPA claim could arise under the Commerce Clause portion of the statute). However, the court in *Shabazz* found that because the plaintiff had

-5-

advanced facts suggesting that the challenged prison regulation affected interstate commerce, his claims for money damages against the defendants in their individual capacities survived summary judgment at that juncture. *See* 2012 WL 463562, at *10.

Here, as in *Shabazz*, Coleman has advanced facts suggesting that the following prison regulations at issue affect interstate commerce: (1) the CD Policy limiting inmates' purchase of religious spoken word CDs to a single vendor; (2) the policy limiting Muslim inmates' purchase of prayer oil to a single vendor; and (3) the food service policy which does not consist of a Halal-certified diet including Halal meat. Inasmuch as the issue remains unsettled, I find that granting summary judgment in the defendants' favor on these enumerated RLUIPA claims for money damages against the defendants in their individual capacities is inappropriate at this time, and I recommend that the court deny the same.

To the extent that Coleman sues the VDOC under § 1983, I find that this is not cognizable because neither a state nor a state agency are persons for purposes of § 1983. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). That being the case, I recommend that the court dismiss the VDOC as a defendant in this case. The defendants argue that they also are immune from suit under § 1983 in their official capacities for monetary damages, as such suits are not cognizable under § 1983. I agree. *See Will*, 491 U.S. at 70-71 (holding that state officials sued in their official capacities are not "persons" within the meaning of § 1983.) Thus, to the extent that Coleman seeks to sue the defendants in their official capacities for monetary damages pursuant to § 1983, I recommend that the court dismiss such claims. Both the Supreme Court and the Fourth Circuit have held that state officials sued in their individual capacities are "persons" within the meaning

of § 1983 and are not absolutely immune from personal liability under § 1983 solely by virtue of the official nature of their acts. *See Hafer v. Melo*, 502 U.S. 21, 30-31 (1991); *White v. Gregory*, 1 F.3d 267, 269-70 (4th Cir. 1993). Nonetheless, government officials may enjoy qualified immunity from civil liability in their individual capacities.

### 2. *Qualified Immunity*

The defendants also seek summary judgment in their favor on Coleman's claims based on qualified immunity. "Qualified immunity is an affirmative defense that shields public officers performing discretionary duties from 'liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Lovelace v. Lee,* 472 F.3d 174, 196 (4th Cir. 2006) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). Qualified immunity is "immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526, (1985). Furthermore, qualified immunity may apply to protect officials from civil liability for claims based on violation of constitutional rights or rights under RLUIPA. *See Lovelace,* 472 F.3d at 196-97.

When a government official properly asserts the defense of qualified immunity, he is entitled to summary judgment if either: (1) the facts, taken in the light most favorable to the plaintiff, do not present the elements necessary to state a violation of a constitutional right; or (2) the right was not clearly established such that it would not have been clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *Pearson v. Callahan,* 555 U.S. 223

(2009).[5] A right is clearly established when a legal question has "been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the State . . . ." *Wallace v. King*, 626 F.2d 1157, 1161 (4th Cir. 1980). As long as the conduct's unlawfulness is manifest under existing authority, the exact conduct does not need to be specifically proscribed. *See Wilson v. Layne*, 526 U.S. 603, 614-15 (1999).

### 3. First Amendment & RLUIPA Overview

Coleman raises several claims that his right to the free exercise of his religion under the First Amendment and RLUIPA have been violated. Courts have held that although inmates lose some constitutional protections upon incarceration, they retain the right to freely worship while in prison. *See McManus v. Bass*, 2006 WL 753017, at *4 (E.D. Va. Mar. 22, 2006) (citing *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987); *Bell v. Wolfish*, 441 U.S. 520, 545 (1979)).

The Free Exercise Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. …" U.S. CONST. amend. 1. The Free Exercise Clause extends to prison inmates. *See O'Lone*, 482 U.S. at 348; *Morrison v. Garraghty*, 239 F.3d 648, 656 (4th Cir. 2001). However, an inmate's religious rights must be evaluated within the context of his incarceration. The Supreme Court has long cautioned that "courts are ill equipped to deal with the increasingly urgent problems of prison

---

[5] *Pearson* overruled that part of the Supreme Court's decision in *Saucier v. Katz*, 533 U.S. 194, 205 (2001), which mandated that courts conduct the two-step qualified immunity inquiry in sequential order. *See* 555 U.S. at 234-36. Courts now "have the discretion to decide whether that procedure is worthwhile" and "determine the order of decision making [that] will best facilitate the fair and efficient disposition of each case." *Pearson,* 555 U.S. at 242. Otherwise, *Saucier* remains as binding precedent.

-8-

administration[,]" *Procunier v. Martinez*, 416 U.S. 396, 405 (1974) (dictum), and, thus, the court "must accord deference to the officials who run a prison, overseeing and coordinating its many aspects, including security, discipline, and general administration[,] *Lovelace*, 472 F.3d at 199. This deference is achieved by a rational basis test. The court considers four factors to determine if prison regulations are reasonably related to legitimate penological interests: (1) whether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether the interest is "so remote as to render the policy arbitrary or irrational;" (2) whether there are alternative means of exercising the asserted constitutional right that remain open to inmates; (3) whether the extent to which accommodation of the asserted right will have an impact on prison staff, on inmates' liberty and on the allocation of limited prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action, which may suggest that it is "not reasonable, but is [instead] an exaggerated response to prison concerns." *Lovelace*, 472 F.3d at 200 (quoting *Turner v. Safley*, 482 U.S. 78, 89-92 (1987)).

When applying these factors, the court must "respect the determinations of prison officials." *United States v. Stotts*, 925 F.2d 83, 86 (4th Cir. 1991). The burden of proof under the *Turner* analysis is on the prisoner to disprove the validity of the prison regulation at issue. *See Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

In order to establish a right under the Free Exercise Clause, Coleman must make two threshold showings before turning to the rational basis test. First, Coleman must show that he sincerely holds his religious beliefs. *See Wisconsin v. Yoder*, 406 U.S. 205, 214-16 (1972). Second, Coleman must show that his claims

are rooted in religious belief and are not "purely secular." *Yoder*, 406 U.S. at 215. If Coleman can make these two threshold showings, he then must show that the free exercise of his religion is substantially burdened by the government policy or action at issue. *See Sherbert v. Verner*, 374 U.S. 398 (1963).

RLUIPA requires a "more searching standard of review … than the standard used in parallel constitutional claims: strict scrutiny instead of reasonableness." *Lovelace*, 472 F.3d at 186 (internal quotation marks omitted). Section 3 of RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . unless the government demonstrates that imposition of the burden . . . (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C.A. § 2000cc-1(a) (West 2012). The term "government" as used in § 2000cc-1 is defined broadly to include: "(i) a State, county, municipality, or other governmental entity created under the authority of a State; (ii) any branch, department, agency, instrumentality, or official of an entity listed in clause (i); and (iii) any other person acting under color of State law[.]" 42 U.S.C.A. § 2000cc-5(4)(A) (West 2012). RLUIPA defines religious exercise as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C.A. § 2000cc-5(7)(A) (West 2012). "If a plaintiff produces prima facie evidence" of a RLUIPA violation, "the government shall bear the burden of persuasion on any element of the claim, except that the plaintiff shall bear the burden of persuasion on whether the law (including a regulation) or government practice that is challenged by the claim substantially burdens the plaintiff's exercise of religion." 42 U.S.C.A. § 2000cc-2(b) (West 2012). "As to those elements on which it bears the burden of proof, a government is only entitled to summary judgment if the proffered evidence is such

that a rational factfinder could only find for the government." *Smith v. Ozmint*, 578 F.3d 246, 250 (4th Cir. 2009) (citing *Gooden v. Howard County, Md.*, 954 F.2d 960, 971 (4th Cir. 1992) ("[W]here . . . the movant would have the burden of persuasion at trial, the summary judgment burden is a correspondingly a heavy one.").

As under the First Amendment, although prison officials may not question the truth of an inmate's belief, an inmate must demonstrate that the belief is sincerely held in order to establish a protected right under RLUIPA. *See McManus*, 2006 WL 753017, at *5 (citing *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005)). Under both the First Amendment and RLUIPA, Coleman also must show that his right to the free exercise of his religion has been "substantially burdened." *McManus*, 2006 WL 753017, at *5 (quoting *Hernandez v. Comm'r of Internal Revenue*, 490 U.S. 680, 699 (1989); *see also* 42 U.S.C. § 2000cc-1(a)). RLUIPA does not define "substantial burden." However, the Fourth Circuit has held that a "substantial burden" on religious exercise occurs when a state or local government, through act or omission, puts substantial pressure on an adherent to modify his behavior and to violate his beliefs. *See Lovelace*, 472 F.3d at 187. The Fourth Circuit in *Lovelace* further held that in assessing whether a substantial burden on religious exercise exists for purposes of RLUIPA, courts must not judge the significance of the particular belief or practice in question. *See* 472 F.3d at 187 n.2.

### 4. Plaintiff's Claims

#### a. CD Policy

By Memorandum dated April 30, 2010, former Deputy Director of the

VDOC, John Jabe, instituted a policy allowing inmates to purchase "religious, non-music CDs" from only Jones Express Music, ("JEM"), and from only a list of approved religious CDs. These CDs were required to be in English only, and they could not exceed about one hour in length, among other things. This Memorandum further stated that inmates could borrow religious nonmusic CDs from the institutional Chaplain's library. (Att. 1 to Docket Item No. 38 at 6-7.) By Memorandum dated August 18, 2011, Jabe began to allow inmates to order religious nonmusic CDs through the Chaplain or Institutional Management at their facility, but only if JEM was unable to produce a particular CD. (Att. 1 to Docket Item No. 38 at 8-9.)

First, Coleman raises a § 1983 claim alleging that the CD Policy restricting his purchase of spoken word religious CDs from a single vendor, JEM, violates his right to freely exercise his religion under the First Amendment and RLUIPA. Coleman claims that as a Salafi Muslim, he sincerely believes he is required to listen to religious teachings from "the mouths of the people of knowledge." (Att. 2 to Docket Item No. 42 at 3.) Despite the defendants' allegation that Coleman could access other verbal teachings through congregational worship, television programming and borrowed CDs from the institutional Chaplain, Coleman contends that he cannot do so. Instead, he contends that the only way he can obtain these religious teachings is by purchasing their speeches on CD, and, under the CD Policy, he must purchase them from JEM. However, Coleman contends that he cannot do business with JEM because JEM also sells music CDs, music is unlawful to Muslims, and it is impermissible in Islam to aid such "deviants." (Docket Item No. 12, ("Amended Complaint"), at 5.) Coleman also contends that JEM obtains some of its religious spoken word CDs from a company that, in turn, sells the writings of Sayyid Qutb "and by doing so indirectly supports so-called

-12-

'Islamic terrorism' because Qutb is the author of the modern terrorist movements." Coleman describes his choice as either exercising his religion and aiding "deviants" or forgoing his religious obligations. The court finds that Coleman has presented evidence of a sincerely held religious belief and that the CD Policy substantially burdens the free exercise of his religion. That being the case, under the RLUIPA analysis, the burden shifts to the defendants to present evidence that the CD Policy furthers a compelling governmental interest and is the least restrictive means of furthering that interest.

Courts should apply this standard with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." "Of these enumerated concerns, security deserves 'particular sensitivity.'" *Lovelace*, 472 F.3d at 190 (quoting *Cutter*, 544 U.S. at 722). "In this regard, 'RLUIPA [is not meant] to elevate accommodation of religious observances over an institution's need to maintain order and safety.'" *Couch v. Jabe*, 679 F.3d 197, 201 (4th Cir. 2012) (quoting *Cutter*, 544 U.S. at 722). "[A] court should not rubber stamp or mechanically accept the judgments of prison administrators." *Couch*, 679 F.3d at 201 (quoting *Lovelace*, 472 F.3d at 190). Instead, "due deference will be afforded to those explanations that sufficiently 'take[] into account any institutional need to maintain good order, security, and discipline.'" *Couch*, 679 F.3d at 201 (quoting *Lovelace*, 472 F.3d at 190). The "burden of justifying a policy in terms of security concerns is an 'unremarkable step.'" *Couch*, 679 F.3d at 201 (quoting *Lovelace*, 472 F.3d at 190). However, a bare assertion that a policy is for security reasons, does not, by itself, explain why the security interest is compelling. *See Smith*, 578 F.3d at 252.

The defendants have submitted the affidavit of Low's Cei, the Chair of the VDOC FRC, stating that using one vendor for distribution of CDs makes the process more uniform and standardized, streamlines the CD approval process because once a CD is approved once, it is added to the approved purchase list so that any offender may purchase it, and decreases the chances of contraband entering the prisons and the CDs being pirated or tampered with. (Att. 1 to Docket Item No. 38, ("Cei Affidavit"), at 2.) Thus, the defendants argue that the CD Policy serves the compelling governmental interest of maintaining prison security and inmate and staff safety, as well as cost containment. The defendants argue that CDs present a significant challenge in prisons due to their easy alteration or supplementation of digital content that is not readily observable. They also argue that JEM has great financial incentive to thoroughly review CDs before packaging and delivering them to inmates because their contract could be canceled if they delivered a CD to an inmate that had been improperly labeled or tampered with. The defendants argue that this essentially adds an extra level of review to the process, making the introduction of contraband less likely. Next, the defendants contend that using a single vendor makes it easier for them to spot an anomaly in packaging or delivery. JEM has its own packaging and delivery procedures that the defendants can easily recognize, allowing them to know that a package came from JEM, that it had not been altered en route and, if there is any question, defendants argue that they can call JEM and know the person they are speaking with is, in fact, a JEM source. The defendants argue that if inmates are permitted to order from vendors of their choice, they cannot familiarize themselves with every vendor's packaging and delivery procedures, making it impossible to readily ascertain whether a package has been altered or whether a third party is posing as a vendor to provide contraband to an inmate.

The defendants also argue that using a single CD vendor serves the purpose of cost containment by reducing the administrative costs that would otherwise be required for security purposes because if CDs were being purchased from multiple vendors, the defendants would have to devote considerably more resources to review the incoming discs for possible alteration, pirating or other tampering. They contend that, given the nature of CDs, they would have to review for content every CD that entered the prison and that the cost of such a process would be prohibitive. However, by restricting the source to a single vendor, that vendor has a vested interest in ensuring that the CDs are legitimate, nonpirated, unaltered copies of the original recording, meaning that costs can be contained to that required for the monitoring of a single vendor, while still maintaining security.

Based on Cei's affidavit testimony and the arguments contained in the defendants' brief, I find that the defendants have presented evidence that the CD Policy furthers the compelling governmental interests of institutional security, as well as cost containment. However, for the following reasons, I find that the defendants have failed to present evidence that the CD policy is the least restrictive means of furthering the stated compelling governmental interests.

RLUIPA adopts a strict scrutiny standard, and "[i]n strict scrutiny contexts other than RLUIPA, 'the Supreme Court has suggested that the Government must consider and reject other means before it can conclude that the policy chosen is the least restrictive  means.'"  *Couch*, 679 F.3d at 203 (quoting *Washington v. Klem*, 497 F.3d 272, 284 (3rd Cir. 2007)).  The Fourth Circuit in *Couch* held that it was sensible in light of RLUIPA's plain language to require the same consideration. *See* 679 F.3d at 203.   The court in *Couch* noted that it had required the government, consistent with the RLUIPA statutory scheme, to "acknowledge and

-15-

give some consideration to less restrictive alternatives." 679 F.3d at 203.

Coleman states that he wishes to order religious spoken word CDs directly from publishers as he had done in the past prior to the implementation of the CD Policy at issue. He notes that the VDOC already has a Publication Review Committee, ("PRC"), in place that can approve CDs from the publishers from whom he wishes to order with no more effort than is required to approve CDs from JEM. He, likewise, contends that the VDOC has the FRC already in place that also can approve CDs from the publishers from whom he wishes to order with no more effort than is involved in approving any other religious item. The defendants have offered the affidavit of Cei, the Chair of the FRC. However, Cei does not address whether the CD Policy is the least restrictive means of achieving the alleged compelling governmental interests of security and/or cost containment. Cei also does not address any alternatives to the CD Policy in question, nor does he address the feasibility of Coleman's specific request to order directly from publishers, as opposed to secondary vendors, or what effect, if any, the presence of the already-existing FRC and PRC would have on the security review process. In their brief, the defendants simply argue that allowing Coleman to order from a vendor of his choice would subject the VDOC to potentially numerous requests from other inmates to do the same or subject it to equal protection claims. Given the complete lack of affidavit testimony addressing the issue and the failure of the defendants' brief to address Coleman's suggested alternatives in any meaningful manner, I find that the defendants have failed to meet their burden of showing that the CD Policy is the least restrictive means of furthering the stated compelling governmental interests.

The court next considers Coleman's claim that the CD Policy violates his

First Amendment rights under the Free Exercise Clause. Applying *Turner's* rational basis factors, I first find, for all of the reasons asserted by the defendants set forth above, that there is a "valid, rational connection" between that policy and prison security and cost containment. For instance, allowing inmates to purchase CDs from a single vendor certainly makes easier the prison's job of screening the incoming CDs for any outward anomalies since JEM uses one uniform type of packaging and delivery system. Put another way, prohibiting a varied group of CD vendors from sending their wares into the prison reduces the likelihood of contraband or altered CDs from entering the prison walls, thereby increasing the safety of inmates and staff. Likewise, only having to screen CDs from one vendor who uses a uniform packaging and delivery system saves prison resources and serves cost containment. Thus, this factor weighs in favor of the defendants. Next, alternative means of exercising religious rights remain open to inmates because purchasing CDs is not the only way inmates may practice their religion at Pocahontas. On the record before the court, it is clear that inmates may attend weekly worship services, they may view religious television programming, they may check out religious materials from the Chaplain's library, and they may pray at any time in their own cells, among other things. Again, this factor weighs in favor of the defendants. Next, the defendants argue that allowing inmates to order religious CDs directly from vendors of their own choosing would result in an allocation of extra manpower for security screening and increased costs associated therewith, as well as increased risk of the introduction of contraband into the prison. Therefore, this factor weighs in favor of the defendants, as well. Finally, the fact that prior to the implementation of the CD Policy at issue, Coleman was allowed to order directly from the CD publishers of his choosing is evidence that there are, at least, arguably, "obvious, easy alternatives" to the CD Policy, suggesting that it may not be reasonable. Thus, this factor weighs in favor of

-17-

Coleman.

Because three of the four factors weigh in favor of the defendants, because the plaintiff bears the burden of disproving the policy at issue, and because the court must "respect the determination of prison officials," *see Stotts*, 925 F.2d at 86, I find that the defendants have shown that the CD Policy serves a legitimate penological interest, and I recommend that the court grant the defendants' Motion on Coleman's § 1983 claim alleging a First Amendment violation on this issue.

For the following reasons, I recommend that the court find that Jabe also is entitled to qualified immunity on this claim. Coleman claims that the CD Policy violates his right to freely exercise his religion. This claim is based on Coleman's allegation that he is forced to do business with JEM, a company that also sells music CDs, which is impermissible in Islam, and that JEM also allegedly supports Islamic terrorism. The right to the free exercise of religion is clearly established under both the First Amendment and RLUIPA. However, even if all of Coleman's allegations are true, I find that a reasonable person in Jabe's position in implementing the CD Policy would not have known that limiting inmates' CD purchases to the single vendor, JEM, would violate inmates' free exercise of religion. As stated previously, it is well-settled that prison administrators are given wide latitude in decisions regarding prison security, and there is no Supreme Court, Fourth Circuit or Virginia Supreme Court case law to suggest that such a CD Policy is violative of inmates' religious rights. Therefore, I recommend that the court find that Jabe is entitled to entry of summary judgment based on qualified immunity on Coleman's claims that the CD Policy violates his right to freely exercise his religion under both the First Amendment and RLUIPA.

Case 7:11-cv-00518-SGW-PMS   Document 57   Filed 12/26/12   Page 18 of 84   Pageid#: 724

Coleman also argues that the CD Policy violates his First Amendment rights to freedom of speech and freedom of the press because he is not allowed to purchase his required religious CDs from the publishers of his choosing as he could before the policy went into effect. Coleman does not elaborate on this argument, and while the court must construe his claims liberally, it is not obliged to construct his arguments for him, and declines to do so. *See Haines v. Kerner*, 404 U.S. 519 (1972)

Coleman further argues that the CD Policy violates the Establishment Clause of the First Amendment because it prevents him from engaging in religious activities required by his faith or forces him to support a "ministry of terror" against the dictates of his conscience. The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion." U.S. CONST. amend. 1. In *Lemon v. Kurtzman*, 403 U.S. 602 (1971), the Supreme Court created a three-part test for determining whether a state action violates the Establishment Clause. Under *Lemon*, the state action must possess a secular purpose, the action's primary effect must not be the advancement or inhibition of religion and it must not result in an excessive entanglement between church and state. *See* 403 U.S. at 612-13 (citation omitted). If a state action violates even one of these prongs, that state action is unconstitutional. *See Koenick v. Felton*, 190 F.3d 259, 265 (4th Cir. 1999) (citing *N.C. Civil Liberties Union Legal Found. v. Constangy*, 947 F.2d 1145, 1147 (4th Cir. 1991)). To be constitutional, a state action must have a "clearly secular purpose." *Wallace v. Jaffree*, 472 U.S. 38, 56 (1985). However, it is not required that the primary purpose of the action be secular. *See Constangy*, 947 F.2d at 1150. Moreover, "it is required that the statement of such purpose be sincere and not a sham." *Edwards v. Aguillard*, 482 U.S. 578, 586-87 (1987). The first prong of the *Lemon* test is a "fairly low hurdle."

Case 7:11-cv-00518-SGW-PMS   Document 57   Filed 12/26/12   Page 19 of 84   Pageid#: 725

*Barghout v. Bureau of Kosher Meat & Food Control*, 66 F.3d 1337, 1345 (4th Cir. 1995). The second prong "asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval [of religion.]" *Wallace*, 472 U.S. at 56 n.42 (quoting *Lynch v. Donnelly*, 465 U.S. 668, 690 (1984) (O'Connor, J., concurring)). Thus, under the second prong of *Lemon*, the government's intent is irrelevant, but the court must focus on how the action is perceived. *See Constangy*, 947 F.2d at 1151. As to the third prong of the *Lemon* test, the involvement of government funds is a factor to consider in deciding whether there is entanglement. *See Lynch*, 465 U.S. at 684. "Entanglement is a question of kind and degree." *Lynch*, 465 U.S. at 684. In deciding questions of entanglement, the Supreme Court has been particularly concerned about "ongoing, day-to-day interaction between church and state." *Lynch*, 465 U.S. at 684. Another kind of entanglement may result when the challenged practice leads to divisiveness along religious lines. *See Lemon*, 403 U.S. at 622.

As stated above, I find that the purpose of the CD Policy is to further institutional security and to contain prison costs. Thus, it has a purely secular purpose whose primary effect is not the advancement of any religion. Therefore, Coleman has failed to show that the primary effect of the CD Policy is the advancement of religion, and there is no evidence before the court that such is the case. JEM is not associated with any one religion, nor does Coleman claim that he cannot receive the CDs he wishes to purchase from JEM. Additionally, if a particular CD is not available through JEM, inmates are allowed to obtain such CDs through the Chaplain or Institutional Management at their facility. Coleman has made no showing that the CD Policy results in an excessive entanglement between church and state. Therefore, I recommend that the court grant the

-20-

defendants' Motion on Coleman's § 1983 claim alleging a violation of the Establishment Clause pertaining to the CD Policy.

Lastly, Coleman argues that the CD Policy violates the Privileges and Immunities Clause of the Fourteenth Amendment because it deprives him of the ability to engage in interstate commerce with the two CD publishers, based in North Carolina and Pennsylvania, with whom he had conducted business in the past. I find that this argument simply is misplaced. Without delving into a lengthy analysis of the Privileges and Immunities Clause, it is sufficient to say that it provides that the "Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." Article IV, § 2, cl. 1. The Clause was designed "to place the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those States are concerned." *Supreme Court of Va. v. Friedman*, 487 U.S. 59, 64 (1988) (quoting *Paul v. Virginia*, 8 U.S. (1 Wall.) 168, 180 (1869)). When examining an alleged Privileges and Immunities Clause violation, the court must undertake a two-part inquiry. First, the activity in question must be "'sufficiently basic to the livelihood of the Nation' . . . as to fall within the purview of the Privileges and Immunities Clause. . . ." *Friedman*, 487 U.S. at 64 (quoting *United Bldg. & Constr. Trades Council v. Mayor & Council of Camden*, 465 U.S. 208, 221-22 (1984) quoting *Baldwin v. Fish & Game Comm'n of Montana*, 436 U.S. 371, 388 (1978)). This is because it is "'[o]nly with respect to those "privileges" and "immunities" bearing on the vitality of the Nation as a single entity' that a State must accord residents and nonresidents equal treatment." *Friedman*, 487 U.S. at 64-65 (quoting *Supreme Court of N.H. v. Piper*, 470 U.S. 274, 279 (1985) (quoting *Baldwin*, 436 U.S. at 383)). Second, if the challenged restriction deprives nonresidents of a protected privilege, it will be invalidated only if the restriction is not closely

-21-

related to the advancement of a substantial state interest.  *See Friedman*, 487 U.S. at 65 (citing *Piper*, 470 U.S. at 284).

The CD Policy is enforced against citizens of all states alike.  For example, it is not enforced against inmates who are noncitizens of Virginia, while inmates who are Virginia citizens are not subject to the policy.  Additionally, Coleman's argument with regard to the CD Policy appears to be more of an interference with interstate commerce argument than a Privileges and Immunities argument. However, he has not provided the court with sufficient support or argument therefor, and the court will not construct any such arguments on his behalf.  All of this being said, I recommend that the court grant the defendants' Motion on Coleman's § 1983 claim alleging a violation of the Privileges and Immunities Clause pertaining to the CD Policy.

Coleman also argues that the CD Policy violates federal antitrust laws.  In his Original Complaint, which he incorporates by reference into his Amended Complaint, Coleman alleges that T. Jones of JEM is a former VDOC employee who "plotted to, illegally and in violation of Federal Anti-trust laws, monopolize the CD/tape business within the entire Department of Corrections."  Coleman further alleges that with Jabe's help, Jones was able to carry out this plan.  While allegations of a pro se complaint are held to less stringent standards than formal pleadings drafted by attorneys, *see Haines*, 404 U.S. at 520, it holds true that Coleman must make more than conclusory allegations without appropriate factual support.  I find that Coleman has done nothing more than make conclusory allegations upon which he bases his argument that the CD Policy violates federal antitrust laws.  For this reason, I recommend that the court grant the defendants' Motion on this claim.

### b. *Prayer Oil*

Pursuant to VDOC Operating Procedure, ("OP"), 802.1, relating to "Offender Property," "[o]ffenders may purchase authorized personal items from the commissary or from approved mail order sources." However, "[i]t is expected that all purchases of personal property items that are available from the Commissary should be made from the Commissary, unless a documented medical reason necessitates a purchase from a mail order source approved by the facility." (Att. 2 to Docket Item No. 38 at 11.) An attachment to OP 802.1 states that offenders may possess one, one-ounce bottle of nonflammable prayer oil. (Att. 3 to Docket Item No. 38 at 6.) The defendants have provided an affidavit from S.K. Young, Warden at Pocahontas, stating that all items must be purchased from a state-approved vendor and that Keefe, the supplier of the Commissary at Pocahontas, is such a state-approved vendor. (Att. 2 to Docket Item No. 38, ("Young Affidavit"), at 2.) Young testified that inmates are limited to one bottle of prayer oil at a time for security reasons, including storage and availability. (Young Affidavit at 2.) He also testified that Pocahontas is following the VDOC's operating procedures regarding this prayer oil issue. (Young Affidavit at 2.)

Coleman alleges that OP 802.1, restricting the purchase of prayer oil from a single vendor and limiting such purchase to one bottle weekly violates his right to freely exercise his religion under both the First Amendment and RLUIPA. He states that he sincerely believes that he must apply prayer oil every time he prays and that he must acquire this oil from "legal" Islamic sources, which OP 802.1 prevents because Keefe sells swine and idols and takes interest, all of which are illegal in Islam. He further states that he sincerely believes that he cannot do

-23-

business with Keefe when acquiring sacred religious accoutrements because these items are to be used in the sacred ritual of prayer. Coleman wishes to acquire such prayer oil from an Islamic oil vendor. He further argues that the limitation to one, one-ounce bottle of oil at a time, is not enough to last for an entire week, especially during the month of Ramadan.[6]

I find that the evidence presented by Coleman has failed to show that the restriction in the quantity of prayer oil imposes a substantial burden on the exercise of his religion. The defendants suggest that Coleman use less prayer oil each time he prays so that the one-ounce bottle will last for the entire week. Coleman has offered no evidence of how much prayer oil must be used each time he prays, but only states that he must use it each time he prays and that the bottle will not last for the week. He also does not address whether he could use less oil. That being the case, I find that he has failed to meet his burden of showing that his religion is substantially burdened by the provision in OP 802.1 that allows for only one, one-ounce bottle of prayer oil per week, and I recommend that the court grant the defendants' Motion on Coleman's § 1983 claim alleging a violation of the First Amendment and a statutory violation of RLUIPA insofar as they pertain to the restriction on the quantity of prayer oil. That being said, I further find that the defendants are entitled to qualified immunity on these claims, and I recommend that the court so find. However, for the reasons that follow, I find that Coleman has made a sufficient showing that his right to freely exercise his religion is substantially burdened by having to purchase religious accoutrements, including prayer oil, from only Keefe.

I find that Coleman has presented evidence to establish a sincerely held

---

[6] Coleman states that trips to the commissary may be made on a weekly basis.

religious belief that he cannot purchase religious accoutrements from a vendor that sells swine and idols and takes interest, such as Keefe. He also has sufficiently stated a sincerely held religious belief that he must use prayer oil for daily prayers. Under OP 802.1, Coleman can obtain prayer oil from only Keefe. Therefore, I find that he has sufficiently shown that OP 802.1 substantially burdens the free exercise of his religion, as he must abandon a religious precept or go without prayer oil. Having made the requisite substantial burden showing, under RLUIPA, the burden shifts to the defendants to show a compelling governmental interest that is furthered by the policy. As with the single religious CD vendor, the defendants contend that the use of the single commissary vendor, Keefe, for personal property items, serves the purpose of reducing prison contraband, thereby maintaining the security and safety of inmates and staff. In his affidavit, Warden Young states only that "[u]sing one approved vendor is done in an effort to keep offender property and quantities uniform." (Young Affidavit at 2.) In their brief, the defendants argue that Keefe is state-approved and cooperates by selling only VDOC-approved products and obeying all security regulations pertaining to inmates and personal property. They further state in their brief that to permit a prisoner to dictate the choice of a vendor of personal property to inmates would be "an outrageous breach of security." However, using *Couch*, 679 F.3d 197, and *Smith*, 578 F.3d at 252 as guidance, I find that such blanket statements are insufficient to make the necessary showing of a compelling governmental interest. In *Couch*, the Fourth Circuit found that the defendants must connect the policy restrictions at issue to the specific concerns, whether they be health concerns or security concerns, and show that those concerns are furthered by the policy. *See* 679 F.3d at 202. In *Couch*, this was done through affidavit testimony. Likewise, in *Smith*, the Fourth Circuit held that "conclusory, one-sentence explanation[s] do[] not, by [themselves], explain why the security interest is compelling." 578 F.3d at

252 (citing *Lovelace*, 472 F.3d at 190).

Applying *Turner's* rational basis factors to Coleman's First Amendment free exercise claim, I find that there is a "valid, rational connection" between OP 802.1 and prison security. As Warden Young testified in his affidavit, the purpose of OP 802.1 is to keep offender property and quantities uniform. This clearly bears a rational connection to prison security because allowing inmates to have personal property that differs in any way creates the very real potential for friction among inmates. This, in turn, compromises the safety and security of inmates and staff. In their brief, the defendants also argue that having only one commissary vendor reduces prison contraband, thereby maintaining security and safety of inmates and staff. Therefore, the first *Turner* factor weighs in favor of the defendants. Next, as discussed with regard to the CD Policy, there are alternative means for inmates to exercise their religion at Pocahontas, including weekly congregational worship services, viewing television programming, checking out religious materials from the Chaplain's library and praying in their own cells at any time, among other things. Thus, the second *Turner* factor also weighs in favor of the defendants. Likewise, allowing Coleman's suggested accommodation, i.e. an Islamic prayer oil vendor, would potentially open the floodgates for inmates of various religions seeking their own vendors for religious items. Finally, Coleman has provided no evidence that there is an "obvious, easy alternative" to the single vendor policy. Thus, I find that OP 802.1 serves a legitimate penological interest, and I recommend that the court grant the defendants' Motion on Coleman's claim alleging a First Amendment violation with regard thereto.

For the following reasons, I also find that Jabe is entitled to qualified immunity on this claim. While the right to the free exercise of religion is clearly

established under both the First Amendment and RLUIPA, I find that a reasonable person in Jabe's position would not have known that limiting inmates' prayer oil purchases to a single vendor, Keefe, would violate inmates' free exercise of religion. There is no Supreme Court, Fourth Circuit or Virginia Supreme Court case law to suggest that such a policy is violative of inmates' religious rights. Therefore, I recommend that the court find that Jabe is entitled to entry of summary judgment based on qualified immunity on Coleman's claims that OP 802.1 violates his right to freely exercise his religion under both the First Amendment and RLUIPA.

Coleman also argues that OP 802.1 violates his rights under the Privileges and Immunities Clause of the Fourteenth Amendment because another federal court has found that Muslim prisoners may possess two bottles of prayer oil. Although Coleman cites to *Charles v. Verhagen*, 220 F. Supp. 2d 937 (W.D. Wis. 2002) and *Perez v. Frank*, 433 F. Supp. 2d 955 (W.D. Wis. 2006) as support for this argument, I first note that the court in neither of those cases allowed the possession of two bottles of prayer oil. In any event, I find that the Privileges and Immunities Clause is not indicated under the circumstances presented. More specifically, even if a federal court in Wisconsin had held that Muslim prisoners can possess two bottles of prayer oil under RLUIPA, that does not mean that all federal prisoners around the country also may do so. All RLUIPA cases are fact-specific, and one case holding that inmates may possess two bottles of prayer oil does not establish the same for all prisoners nationwide. Additionally, the purpose of the Privileges and Immunities Clause is to ensure that noncitizens and citizens of a State are treated equally regarding those privileges and immunities bearing on the vitality of the nation. *See Friedman*, 487 U.S. at 64-65. Such is not the case here. I find that whether an inmate incarcerated in Virginia can possess the same

quantity of prayer oil as an inmate incarcerated in Wisconsin, or any other state, is not the type of issue "bearing on the vitality of the nation" necessary to trigger the protections of the Privileges and Immunities Clause. That being the case, I recommend that the court grant the defendants' Motion on Coleman's § 1983 claim alleging a violation there. Accordingly, I also recommend that the court find that the defendants are entitled to qualified immunity on this claim.

### c. Grooming Policy

Next, Coleman raises a § 1983 claim alleging that the VDOC Grooming Policy prohibiting him from growing a beard violates his right to freely exercise his religion under both the First Amendment and RLUIPA. Coleman states that he sincerely believes that his religion requires him to grow a beard, and the defendants do not question that Coleman sincerely holds this religious belief. Therefore, for purposes of deciding this Motion, I find that Coleman has sufficiently stated such. I also find that Coleman has shown that the Grooming Policy substantially burdens the exercise of his religion. In particular, the Grooming Policy, set out in OP 864.1, "Offender Grooming and Hygiene," specifically states that noncompliance therewith will result in the offender being given an order to comply, and if the offender refuses to comply, he will be charged with Offense Code 133, Refusal to Obey an Order To Comply with the Department's grooming standard. He then will be placed in Pre-Hearing Detention. (Enclosure A to Att. 4 to Docket Item No. 38, ("OP 864.1"), at 3-4.) A grooming violation incident consists of an order, a conviction and an assignment to segregation, where the offender will remain pending transfer to an appropriate housing unit. (OP 864.1 at 4.) Thus, the Grooming Policy obliges Coleman to shave his beard, in violation of a sincerely held religious belief, or suffer the

consequences of being placed in segregation. *See Couch*, 679 F.3d at 200-01 (citing *Warsoldier v. Woodford*, 418 F.3d 989, 995-96 (9th Cir. 2005) (removing privileges in effort to compel compliance despite not physically forcing inmate to cut his hair, qualifies as substantial burden).

Next, I find the defendants have met their burden of showing that there is a compelling governmental interest that is furthered by the Grooming Policy, namely institutional security, inmate and staff health and safety and sanitation. The stated purpose contained within OP 864.1 is to "facilitate the identification of offenders and to promote safety, security, and sanitation." (OP 864.1 at 1.) The Grooming Policy also states that "[h]air styles and beards that could conceal contraband; promote identification with gangs; create a health, hygiene, or sanitation hazard; or could significantly compromise the ability to identify an offender are not allowed." (OP 864.1 at 2.) The defendants also have submitted an affidavit from A. David Robinson, Chief of Corrections Operations for the VDOC, in which he testified that, in addition to security concerns, positive identification of each offender is important in the event of escape from confinement and that prisoners with long hair and beards can rapidly change their appearance so as to compromise rapid identification. (Att. 4 to Docket Item No. 38, ("Robinson Affidavit"), at 2.) Robinson testified that even inside the prison, positive, quick identification of offenders facilitates the orderly operation of each facility. (Robinson Affidavit at 2.) He testified that there are no exceptions to the Grooming Policy based on an offender's religion. (Robinson Affidavit at 3-4.) Robinson testified that when an offender is transferred to segregation for a violation of the Grooming Policy, it allows them to be more closely monitored, and they are isolated from other prisoners from whom they might retrieve, or to whom they might pass, contraband items. (Robinson Affidavit at 3.) He testified that prisoners who might have

designs on altering their appearance, either as part of an escape plot or to shield their ready identification by prison employees, will have a reduced chance of escape and a minimal opportunity to confuse in-prison identification. (Robinson Affidavit at 3.) He further testified that prisoners whose longer hair or beards might promote the spread of lice or other contagious diseases will be effectively separated from contact with other offenders. (Robinson Affidavit at 3.)

Thus, the stated purpose contained within OP 864.1, the testimony in Robinson's affidavit and the relevant case law support a finding that, in the prison setting, suppression of contraband, maintaining discipline and security among the inmate population, maintaining health and safety of inmates and staff and preventing prisoners from quickly changing their appearance constitute compelling governmental interests. *See Cutter*, 544 U.S. at 722; *Longoria v. Dretke*, 507 F.3d 898, 903-04 (5th Cir. 2007); *Washington*, 497 F.3d at 283; *see also Hines v. S.C. Dep't of Corrs.*, 148 F.3d 353, 358 (4th Cir. 1998).

Nevertheless, I find that the defendants have failed to meet their burden of showing that the Grooming Policy is the least restrictive means of furthering these compelling governmental interests. The defendants, in their brief, have stated only that this court affirmed the Grooming Policy in *Couch* under both the First Amendment and RLUIPA. I note, however, that the Fourth Circuit in *Couch*, just recently remanded the case to the district court, finding that the defendants had failed to meet their burden of showing that the Grooming Policy was the least restrictive means of achieving the compelling governmental interests of health and security concerns. *See* 679 F.3d at 204. In any event, the defendants may not simply rely on another case to make the appropriate showing *in this case* that the Grooming Policy is the least restrictive means of furthering the identified

-30-

compelling governmental interests. As the Fourth Circuit stated in *Couch*, the government must acknowledge and give some consideration to less restrictive alternatives, consistent with the RLUIPA statutory scheme. *See* 679 F.3d at 203. Here, the defendants did not even make a blanket statement that the policy is the least restrictive means of furthering the compelling governmental interests of security, safety, health and sanitation. Likewise, Robinson did not testify in his affidavit that the VDOC's Grooming Policy is the least restrictive means of furthering the cited compelling governmental interests. The defendants also have not addressed Coleman's suggested alternative of having two pictures on inmate ID cards, presumably one with a beard (or long hair) and one without, that must be displayed at all times. (Att. 2 to Docket Item No. 42 at 9.) All of this being the case, I find that the defendants have failed to show that the Grooming Policy is the least restrictive means of achieving the stated compelling governmental interests.

Applying *Turner's* rational basis factors to Coleman's First Amendment claim regarding the Grooming Policy, I find that there is a "valid, rational connection" between the policy and prison security, safety, inmate health and sanitation for all the same reasons stated above. Thus, this *Turner* factor weighs in favor of the defendants. Next, alternative means of exercising religion remain open to the inmates at Pocahontas because inmates may practice their religion in ways other than growing their hair or beards. As stated herein, inmates may attend weekly worship services, they may view religious television programming, they may check out religious materials from the Chaplain's library, and they may pray at any time in their own cells, among other things. Therefore, this *Turner* factor also weighs in favor of the defendants. Next, allowing inmates to grow their hair or beards would create security risks for inmates and prison staff, and it would cause a strain on prison resources. Searching inmates with long hair and/or beards

-31-

is less effective and more time consuming than searching those with short hair and/or no beards, and, thus, contraband is more likely to enter jails, safety of inmates and guards is decreased, and more guards would need to be hired. *See Braithwaite v. Hinkle*, 752 F. Supp. 2d 692, 694 (E.D. Va. 2010) (citing *Hines*, 148 F.3d at 358). In an unpublished opinion, *McRae v. Johnson*, 261 F. App'x 554 (Jan. 7, 2008), the Fourth Circuit "recognized and emphasized that the VDOC [grooming] policy was implemented to address serious penological and governmental concerns." *Braithwaite*, 752 F. Supp. 2d at 696.

> [I]nmates had hidden contraband and/or weapons in their hair or beard, with one prison officer being injured while "trying to shake down an inmate and shake down his hair, and there was a razor blade or something in the hair …." Director Johnson also testified that the VDOC's Grooming Policy significantly cuts down on the number of inmate shakedowns during which a prison officer must run his hands all through an inmate's hair and beard if he has one in order to check for hidden contraband or weapons. According to Director Johnson, prison officers are hesitant to perform shakedowns on long haired and/or bearded inmates, "inmates don't like you putting your hands all through the[ir] hair to start with," shakedowns are time consuming, and the VDOC does "not have enough staff to continually shake people down as they move from one area to another to prevent transporting contraband." In sum, the less need for shakedowns the better. This fact was illustrated by Director Johnson's testimony that approximately six months earlier, officers shaking down an inmate placed in administrative segregation for refusing to cut his hair "found pieces of wire and rope and rocks and tobacco … that were hidden in his hair."

*Braithwaite*, 752 F. Supp. 2d at 696 (quoting *McRae*, 261 F. App'x at 559). It is these same factors that make clear that allowing the requested accommodation would create security risks for inmates and prison staff, and it would cause a strain on prison resources. Therefore, this *Turner* factor weighs in favor of the

Case 7:11-cv-00518-SGW-PMS   Document 57   Filed 12/26/12   Page 32 of 84   Pageid#: 738

defendants. Lastly, there is an argument that there is an easy, obvious alternative to the Grooming Policy at issue, namely, as Coleman suggests, having two pictures on each inmate ID card. Thus, this *Turner* factor weighs in favor of Coleman. However, as three of the four *Turner* factors weigh in favor of the defendants, Coleman bears the burden of disproving the validity of the prison regulation, and prison administrators' determinations are given due deference, I find that the Grooming Policy is reasonably related to a legitimate penological interest.

I also find that the defendants are entitled to qualified immunity on Coleman's claim that the VDOC Grooming Policy violates his right to freely exercise his religion. At the relevant time, there was Fourth Circuit case law upholding the validity of the VDOC Grooming Policy in question. *See McRae*, 261 F. App'x 554.[7] That being said, I find that the defendants did not violate clearly established law and, therefore, are entitled to qualified immunity on this claim, as well.

Coleman also argues that the Grooming Policy constitutes cruel and unusual punishment under the Eighth Amendment. The Eighth Amendment not only prohibits excessive sentences, but it also protects inmates from inhumane treatment and conditions while imprisoned. *See Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). The Eighth Amendment also requires prison officials to take reasonable measures to guarantee the safety of inmates. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984). To establish a

---

[7] I note that, subsequent to Coleman's filing of this suit, the Fourth Circuit decided the *Couch* case discussed herein, in which it vacated and remanded a decision of this court based upon a finding that prison officials failed to make the requisite showing that the VDOC Grooming Policy was the least restrictive means of accomplishing the stated compelling interests.

violation of the Eighth Amendment, inmates "must show both (1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials." *In re Long Term Admin. Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 471 (4th Cir. 1999) (quoting *Strickler v. Waters*, 989 F.2d 1375, 1379 (4th Cir. 1993)) (internal quotation marks omitted). This inquiry has both objective and subjective prongs. *See In re Long Term Admin. Segregation of Inmates Designated as Five Percenters*, 174 F.3d at 471. The alleged deprivation must be, objectively, "sufficiently serious." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). Put differently, a prison official's act or omission must result in the denial of "the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). The second requirement follows from the principle that "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." *Farmer*, 511 U.S. at 834 (quoting *Wilson*, 501 U.S. at 297). To violate the cruel and unusual punishment clause, a prison official must have a "sufficiently culpable state of mind." *Wilson*, 501 U.S. at 297. In-prison conditions cases require "deliberate indifference" to inmate health or safety in order to find an Eighth Amendment violation. *Strickler*, 989 F.2d at 1379.

First, Coleman has not shown that the Grooming Policy requiring him to shave his beard works a serious deprivation of a basic human need. *See Rhodes*, 452 U.S. at 347. For instance, he has not alleged that the defendants have failed or will fail to provide him with "adequate food, clothing, shelter, and medical care" or to protect him from harm. *Farmer*, 511 U.S. at 832. Second, the defendants have not been deliberately indifferent to Coleman's needs. *See Wilson*, 501 U.S. at 303; *Shakka v. Smith*, 71 F.3d 162, 166-67 (4th Cir. 1995). Coleman complains about

-34-

having a condition called pseudofolliculitis.[8]  There is a provision in the Grooming Policy allowing offenders to obtain a no-shave pass for a medical condition that is aggravated by shaving or complete removal of facial hair.  (OP 864.1 at 7.)  The offender must request and maintain a current no-shave pass issued in accordance with Health Service Unit requirements.  (OP 864.1 at 7.)  A no-shave pass expires within one year of the issue date and is valid only at the issuing facility.  (OP 864.1 at 7.)  The offender is responsible for submitting a sick call request for all reevaluations.  (OP 864.1 at 7.)  According to Robinson, there is no medical documentation in Coleman's medical record that he has requested a no-shave pass.  (Robinson Affidavit at 3.)  Also, Coleman has provided no medical records to substantiate his contention that he, in fact, suffers from pseudofolliculitis.  Despite being forced to comply with the Grooming Policy while incarcerated at Pocahontas, he has provided no evidence that his condition was aggravated or, if it was, that it was not appropriately treated.  Additionally, despite allegedly suffering from this condition and, despite the provision in the Grooming Policy allowing an inmate to obtain a no-shave pass for medical reasons, Coleman has provided no evidence that he sought such a no-shave pass at any time during his incarceration at Pocahontas.  Coleman claims that he had a no-shave pass while incarcerated at Wallens Ridge State Prison in 2003, and he sought to obtain one while incarcerated at Keen Mountain Correctional Center in April 2007.  (Att. 2 to Docket Item No. 42 at 8-9.)  However, this request was denied at Keen Mountain.  In any event, I find the defendants cannot be found to have been deliberately indifferent to Coleman's alleged serious medical need when he had not even sought a no-shave

---

[8] Pseudofolliculitis is a bacterial disorder caused by Staphylococcus aureus, occurring chiefly in the beard of blacks, especially in the submandibular region of the neck, the characteristic lesions being erythematous papules, sometimes pustules, containing buried hairs whose tips can easily be freed up. It affects exclusively those who shave.  *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 1378 (27th ed. 1988).

pass based on such a condition at any time during his incarceration at Pocahontas. It is for all of these reasons that I find that Coleman has failed to show that the defendants have violated the Eighth Amendment's prohibition against the infliction of cruel and unusual punishment, and I recommend that the court grant the defendants' Motion with regard to the same. Accordingly, I also recommend that the court find that the defendants are entitled to qualified immunity, as Coleman has failed to establish that they violated clearly established law.

Coleman also argues that the Grooming Policy violates the Privileges and Immunities Clause. However, I find that the Privileges and Immunities Clause is not implicated because the Grooming Policy is applied equally to all inmates who do not have a valid no-shave pass, whether they are Virginia citizens or otherwise. Additionally, I find that this is not the type of issue bearing on the nation's vitality meant to be encompassed by the Privileges and Immunities Clause. Thus, I recommend that the court grant the defendants' Motion on Coleman's § 1983 claim alleging a violation of the Privileges and Immunities Clause related to the VDOC Grooming Policy. Again, I recommend that the court find that the defendants are entitled to qualified immunity on this claim because they have not violated any clearly established law.

### d. Dress Code

Coleman next argues that the dress code at Pocahontas, implemented by Warden Young, prohibiting him from wearing his pants above his ankles, violates his right to freely exercise his religion under the First Amendment and RLUIPA.[9]

---

[9] Given that the dress code at issue was implemented by the Warden at Pocahontas, and given that Coleman now has been transferred to Augusta Correctional Center, his claims for

-36-

Pursuant to the Pocahontas State Correctional Center Orientation Handbook, ("Offender Handbook"), "[p]ant legs are to be kept rolled down and are not to be rolled up above the ankle (pants leg shall not be tucked down inside of sock(s) or shoes)." (Att. 3 to Docket Item No. 38 at 8.) In his affidavit, Warden Young, testified that Coleman "has been advised there are issues other than religion, such as security risks, that must be considered in making facility rules and regulations." (Young Affidavit at 2.) Young further testified that this dress code does not prohibit Coleman from practicing his religion. (Young Affidavit at 2.)

Pointing to a collection of the Prophet Muhammad, Coleman states that he has a sincerely held religious belief that he must not let his pants hang below his ankles, and the defendants do not challenge this belief. (Att. 2 to Docket Item No. 42 at 9.) For purposes of this Motion, I find that Coleman has sufficiently stated that he sincerely holds this religious belief. I cannot, however, find that the dress code imposes a substantial burden on his religion. Coleman bears the burden of showing the existence of a substantial burden. Although the relevant portion of the Offender Handbook has been provided to the court, it does not state what punishment, if any, is meted out for inmates failing to comply with the dress code. Unlike the Grooming Policy, the dress code portion of the Offender Handbook is silent on the punishment for noncompliance. Likewise, Warden Young's affidavit contains no testimony regarding the punishment for noncompliance with the dress code, and Coleman himself has provided the court with no information as to the consequences for such noncompliance. Therefore, on the record before the court,

---

declaratory and injunctive relief are moot. However, he still may have claims for monetary relief against the defendants. *See Incumaa v. Ozmint*, 507 F.3d 281, 286-87 (4th Cir. 2007) (transfer of an inmate from a location where he is subject to a challenged condition to a different location where he is no longer subject thereto moots his claims for injunctive or declaratory relief, even if a claim for money damages survives); *see also Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) (holding that a prisoner transfer mooted a request for declaratory and injunctive relief).

Coleman really is under no pressure to modify his behavior because no punishment has been specified. On the record before the court, I find that Coleman has failed to show that the free exercise of his religion has been substantially burdened by the dress code prohibiting him from wearing his pants above his ankles. That being said, he cannot establish a First Amendment or RLUIPA violation, and I recommend that the court grant the defendants' Motion on both such claims.

I also find that the defendants are entitled to qualified immunity on Coleman's claim that the dress code prohibiting him from wearing his pants above his ankles violated his right to freely exercise his religion. Specifically, I find that a reasonable person in Warden Young's position would not have known that, in implementing such a dress code that required inmates' pants legs to be "kept rolled down" and "not to be rolled up above the ankle" or tucked down inside of the socks or shoes for the purpose of maintaining institutional order and security, he would violate Coleman's clearly established right to freely exercise his religion. As stated multiple times herein, due deference is accorded to prison officials' decisions regarding prison security, and, there is no Supreme Court, Fourth Circuit or Virginia Supreme Court case law holding that such a dress code is violative of inmates' religious rights in any way. All of this being the case, I recommend that the court find that defendant Young is entitled to qualified immunity on Coleman's claim that the dress code implemented by him violated Coleman's religious rights.

Coleman also argues that the dress code violates the Privileges and Immunities Clause. However, again, I find that this argument is misplaced. As the dress code is applied evenly to inmates who are Virginia citizens, as well as to inmates who are not citizens of Virginia, the Privileges and Immunities Clause simply is not implicated under the circumstances.

### e.  Prayer in the Pod

Coleman argues that the policy implemented at Pocahontas by Warden Young and contained in the Offender Handbook prohibiting prayer in the pod violates his right to freely exercise his religion under the First Amendment and RLUIPA.[10]  Pursuant to the Offender Handbook, "[p]rayer is restricted to the offender's assigned cell."  (Att. 3 to Docket Item No. 38 at 10.)  However, it further states that "[o]ffenders may conduct religious study in the pods as a group" with certain restrictions, including the following: "[t]his activity must be strictly a study of your religion … [n]o more than five offenders can participate at one table … [c]onducting sermons or preaching is not allowed … [and] [t]he activity must be conducted in a quiet manner."  (Att. 3 to Docket Item No. 38 at 10.)  In his affidavit, Warden Young testified that Coleman has been advised numerous times that he cannot conduct services in the pod, but he can study his religion according to the Offender Handbook.  (Young Affidavit at 3.)  He testified that prayer is not allowed by any faith in the pod because it is possible to disturb and/or offend other inmates.  (Young Affidavit at 3.)  Young further testified that large groups are not permitted to congregate in the pod because it could pose a security threat.  (Young Affidavit at 3.)  Young testified that Sunni Muslim offenders meet every Friday from 1:30 p.m. to 2:30 p.m.,[11] Coleman is given the opportunity for religious group study in the pod and is permitted to pray in his cell whenever his religion requires it.  (Young Affidavit at 3.)  Young testified that Coleman is afforded the same

---

[10]  As with the dress code, Coleman's claims for declaratory and injunctive relief pertaining to this issue are moot.  *See Incumaa*, 507 F.3d at 286-87; *see also Williams*, 952 F.2d at 823.

[11]  It has been determined that the needs of Coleman, who professes to be a Salafi Muslim, are met by worshipping with the Sunni Muslims because Salafi Islam is a sect or school of thought of Sunni Islam, as determined by the FRC.  This finding will be discussed in more detail herein.

-39-

rights and opportunities as other offenders at Pocahontas regardless of his religious affiliation and that no special treatment is given to offenders based on their religious affiliation. (Young Affidavit at 3.)

Coleman states that he has a sincerely held religious belief that he must pray in congregation five times daily if three or more Muslims are present. He cites to the Prophet Muhammad stating "Any three in a village or desert among whom the prayer is not called for, will have Satan control them. Therefore, adhere to the Congregation prayer, for the wolf eats the stray sheep." I find that Coleman has sufficiently shown a sincerely held religious belief that he must pray in congregation five times daily if three or more Muslims are present. However, I find that the policy prohibiting prayer in the pod does not substantially burden Coleman's religious exercise because he admits that Warden Young allows congregate prayer in the recreation yard. Thus, while the location of congregate prayer was limited, Coleman still was able to engage in congregate prayer at Pocahontas. That being the case, I recommend that the court grant the defendants' Motion on Coleman's § 1983 claim alleging a violation of the First Amendment and RLUIPA related to the policy prohibiting prayer in the pod.

I also find that Young is entitled to qualified immunity on Coleman's claim that Young's policy prohibiting prayer in the pod violated his right to freely exercise his religion. In particular, I find that a reasonable person would not have known that, by implementing such a policy that prohibited prayer in the pod for reasons of institutional order and security, Coleman's clearly established right to freely exercise his religion would be violated. Again, due deference is accorded to prison officials' decisions regarding institutional security, and there is no Supreme Court, Fourth Circuit or Virginia Supreme Court case law that would put the

defendants on notice that such prohibition of prayer in the pod is violative of inmates' religious rights. Therefore, I recommend that the court find that defendant Young is entitled to qualified immunity on Coleman's claim that the policy implemented by him prohibiting prayer in the pod violated Coleman's religious rights.

Coleman also argues that the policy violates his right to equal protection because Christians at Pocahontas were permitted to pray in the pod. The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. In order to survive summary judgment on an equal protection claim, "a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison*, 239 F.3d at 654. However, proof of discriminatory intent is required to establish a violation of the Equal Protection Clause. *See Shaw v. Martin*, 733 F.2d 304 (4th Cir. 1984). Mere conclusory allegations of discrimination are insufficient, as are mere conclusory allegations of disparities. *See Spaulding v. Dixon, et al.*, 1990 U.S. App. LEXIS 15560, at *2 (4th Cir. Sept. 4, 1990); *Chapman v. Reynolds*, 378 F. Supp. 1137, 1139-40 (W.D. Va. 1974). Coleman alleges that Warden Young allowed Christian inmates to pray in the pod on a daily basis and that he witnessed the same daily. Coleman further alleges that the correctional officers did not enforce the policy on Christian inmates -- only Muslim inmates. In his affidavit, Warden Young does not directly address Coleman's claim that Christians were allowed to pray in the pod, but he states only that "[t]here is no special treatment given to offenders based on their religious affiliation." (Young Affidavit at 3.) I find that, even assuming Coleman can show that he is similarly situated with the

Case 7:11-cv-00518-SGW-PMS   Document 57   Filed 12/26/12   Page 41 of 84   Pageid#: 747

Christian inmates and that he was treated differently from them, he has not made the requisite showing that such disparate treatment was the result of purposeful or intentional discrimination. Instead, Coleman merely concludes from the disparate treatment that the intent was discriminatory. This is not enough to establish an equal protection claim, and I recommend that that court grant the defendants' Motion as it relates thereto. Accordingly, I further find that defendant Young is entitled to qualified immunity on this claim, and I recommend that the court so find.

### f. Halal-Certified Diet

Coleman next argues that the VDOC's food service policy, which does not provide a certified Halal diet including Halal meat, violates his right to freely exercise his religion under the First Amendment and RLUIPA. Citing to the Qur'an, Coleman contends that he has a sincerely held belief that he must consume only a certified Halal diet that contains meat slaughtered in the name of Allah. (Docket Item No. 42, ("Brief in Opposition"), at 40.) The defendants do not challenge that Coleman sincerely holds this religious belief, and the court finds that Coleman has sufficiently shown as much. The defendants have provided an affidavit from Mark Engelke, the Director of Food Services for the VDOC. (Att. 7 to Docket Item No. 38, ("Engelke Affidavit"), at 1-3.) Engelke testified that the Common Fare Diet is designed to specifically meet the dietary needs of the offenders who, for religious reasons, require a Kosher nonpork diet and whose dietary requirements cannot be accommodated with foods provided by the Master Menu. (Engelke Affidavit at 1.) He further testified that the Common Fare Diet is not a vegetarian diet, and it has been analyzed and certified as meeting or exceeding minimum daily nutritional requirements. (Engelke Affidavit at 1.)

-42-

Engelke testified that a hot entrée is served three times weekly in accordance with the Common Fare Diet and is cooked in specially designed Common Fare equipment. (Engelke Affidavit at 2.) He testified that, prior to December 2, 2007, the VDOC provided a hot frozen Kosher meat portion, (either fish, chicken or beef), to offenders three times weekly for those offenders participating in the Common Fare Diet, and the Common Fare Diet, at that time, cost approximately $5.00 to $7.00 daily per offender. (Engelke Affidavit at 2.) The regular menu for offenders at that time cost $1.80 daily per inmate. (Engelke Affidavit at 2.) He testified that providing the Kosher meat portion became cost prohibitive, so to manage costs, the VDOC eliminated the frozen Kosher meat portion, and on December 2, 2007, began offering a newly revised Common Fare menu to include a soy protein based vegetarian meal in place of the hot main entrée. (Engelke Affidavit at 2.) Currently, the regular diet costs $2.00 daily per offender, while the Common Fare Diet costs $3.10 daily per offender. (Engelke Affidavit at 2.) A hot soy protein based vegetarian meal is offered on Monday, Wednesday and Friday, while offenders are served tuna, hard-boiled eggs and peanut butter on the other days of the week. (Engelke Affidavit at 2.) All offenders approved for the Common Fare Diet are required to sign a Common Fare Agreement, which Coleman signed on April 23, 2009. (Engelke Affidavit at 2.) Engelke testified that by signing the agreement, Coleman acknowledged that the Common Fare Diet provided him with an appropriate religious diet that meets or exceeds minimum daily nutritional requirements. (Engelke Affidavit at 2.) Engelke further testified that he consulted with the Islamic leader of the Islamic Center of Virginia who informed him that the Common Fare Diet provided to offenders does, in fact, meet Islamic guidelines, contrary to Coleman's contention that his dietary laws require him to eat Halal meat. (Engelke Affidavit at 3.)

Case 7:11-cv-00518-SGW-PMS   Document 57   Filed 12/26/12   Page 43 of 84   Pageid#: 749

The court finds that the VDOC food service policy substantially burdens Coleman's religious practice because Coleman faces a Hobson's choice of eating a non-Halal diet in violation of his sincerely held religious beliefs or going without food. *See Baranowski v. Hart*, 486 F.3d 112, 125 (5th Cir. 2007) (finding that denying Kosher food to an observant Jew was a substantial burden), *cert. denied*, 552 U.S. 1062 (2007); *see also Nelson v. Miller*, 570 F.3d 868, 879 (7th Cir. 2009). Thus, the burden shifts to the defendants to show that the denial of Halal meat was the least restrictive means of furthering a compelling governmental interest. The defendants contend that the frozen Kosher meat portion was eliminated from the Common Fare Menu because it became cost prohibitive. Replacing the frozen Kosher meat with a hot soy protein-based vegetarian meal three times weekly, while serving tuna, hard-boiled eggs and peanut butter the remaining days, reduced the daily cost per offender from $5.00-$7.00 to $3.10. (Engelke Affidavit at 2.) Cost containment has been held to be a compelling governmental interest. *See Smith,* 578 F.3d at 252; *Lovelace,* 472 F.3d at 190; *Baranowski*, 486 F.3d at 125; *Muhammad v. Sapp*, 388 F. App'x 892, 896 (11th Cir. 2010). Moreover, this court must give deference to the defendants' explanations. *See Lovelace*, 472 F.3d at 182. However, Coleman alleges that Kosher meat and Halal meat are not the same thing. Coleman states that Halal meat is meat that is slaughtered in the name of Allah. He does not specifically state any other differences, and it is not this court's function to research, sua sponte, the differences between Kosher meat and Halal meat. Instead, any such information should have been provided to the court to make the appropriate determination on summary judgment. Nonetheless, without knowing how much it would cost the VDOC to provide Halal meat to inmates, the court cannot determine whether it is cost prohibitive to do so. Therefore, while cost containment has been held to be a compelling governmental interest in general, and although Engelke explained the cost savings obtained by eliminating

-44-

the frozen Kosher meat entrée from the Common Fare Menu, this explanation does not consider at all the cost of including Halal meat in the Common Fare Menu and whether it would be cost prohibitive or not. For these reasons, I find that the defendants have failed to state a compelling governmental interest furthered by the food service policy at issue. That being the case, I find that the court need not address whether the food service policy is the least restrictive means of furthering a compelling governmental interest. It is for these reasons that I recommend that the court deny the defendants' Motion on Coleman's claim that the food service policy violates RLUIPA. For the same reasons, I find that the defendants cannot show that the food service policy is rationally related to the legitimate penological interest of cost containment. Therefore, I recommend that the court deny the defendant's Motion on Coleman's § 1983 claim alleging a First Amendment violation, as well.

Because the defendants have not addressed the issues in the context of Halal meat, as argued by Coleman, I find that they are not entitled to qualified immunity on this issue at this time, and I recommend that the court so find.

Coleman also argues that the defendants have violated the Privileges and Immunities Clause. He argues that once RLUIPA is determined to require state officials to accommodate a religious exercise in any state, then it is clearly established that it must apply to every state because the right in question is one that arises under the United States Constitution and, in that case, creates rights of United States citizenship that are to be applied nationally. However, as stated earlier, RLUIPA cases are fact-specific. There are burdens to be met by the plaintiff *in each case* and burdens to be met by the defendant *in each case*. Those burdens cannot be met by relying on prior cases, but the parties must produce their

-45-

own evidence and carry their own burdens. That being said, I recommend that the court grant the defendants' Motion on Coleman's § 1983 claim alleging a Privileges and Immunities Clause violation with regard to the food service policy.

Next, Coleman argues that the food service policy that fails to provide Halal-certified meat violates the Eighth Amendment's prohibition against cruel and unusual punishment by denying inmates adequate nutrition. He argues that if he were to refuse the diets offered by the VDOC because they are all haram, meaning illegal in Islam, such total abstinence would constitute cruel and unusual punishment. He argues that he does not have to wait until the consummation of a threatened injury to obtain preventative relief. He is petitioning the court for relief under the Eighth Amendment before he must suffer the harm of total abstinence. I disagree with Coleman. First, as stated earlier herein, the case law is settled that a prisoner must show a serious deprivation of a basic human need and deliberate indifference to prison conditions on the part of prison officials to establish an Eighth Amendment cruel and unusual punishment claim. *See Strickler*, 989 F.2d at 1379. The Fourth Circuit has further held that in order to withstand summary judgment on an Eighth Amendment challenge to prison conditions "a plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions." *Strickler*, 989 F.2d at 1381. If Coleman "has not suffered serious or significant physical or mental injury as a result of the challenged condition, he simply has not been subjected to cruel and unusual punishment within the meaning of the Amendment." *Strickler*, 989 F.2d at 1381. Thus, contrary to Coleman's contention, he does, in fact, have to suffer not only some injury, but a serious injury, in order to make out an Eighth Amendment claim. I first note that Engelke testified that the Common Fare Diet has been analyzed and certified as meeting or exceeding minimum daily nutritional

-46-

requirements.  (Engelke Affidavit at 1.)  Coleman provides no evidence to the contrary, nor has he provided any medical evidence to substantiate any claim that he has experienced any significant injury as a result of eating the food from the Common Fare Menu at Pocahontas.  Coleman does not submit that he did not eat the food provided to him, nor does he allege that it was actually harmful to his health.  He also does not allege that he lost any weight or suffered any mental injury as a result of eating the food provided to him at Pocahontas from the Common Fare Menu.  That being the case, I find that Coleman has failed to make a showing of the first prong of an Eighth Amendment claim, and I, therefore, find it unnecessary to discuss whether prison officials were deliberately indifferent to prison conditions.  All of this being said, I recommend that the court grant the defendants' Motion on Coleman's § 1983 claim alleging an Eighth Amendment violation as it relates to the VDOC food service policy.

Even assuming the truth of Coleman's allegations, I find that defendant Jabe is entitled to qualified immunity on Coleman's claim that the VDOC food service policy, which does not provide a Halal diet including Halal meat, violates his right to be free from cruel and unusual punishment.  More specifically, I find that a reasonable person in Jabe's position would not have known that the implementation of such a policy would have resulted in a serious deprivation of a basic human need.  That being said, I recommend that the court find that Jabe is entitled to qualified immunity on Coleman's § 1983 claim alleging an Eighth Amendment violation related to the VDOC food service policy.

g.  *Purchase of Islamic Books*

Coleman next argues that the expenditure of money from the inmate

-47-

commissary fund to purchase religious items for the Chaplain's library violates the Establishment Clause of the First Amendment. Coleman states that in March 2012, he learned from K.S. Richardson, the Chaplain at Pocahontas, that the FRC had approved, and the VDOC had purchased at all of its facilities, Islamic books for Muslim inmates. Richardson informed Coleman that the books were purchased with the inmate commissary fund.[12] Coleman filed an informal complaint, alleging that money from the inmate commissary fund was being improperly used for religious items in violation of the United States Constitution, the Virginia Constitution and a VDOC Operating Procedure. Dave Hammond, Treatment Program Supervisor at Pocahontas, responded to the informal complaint stating that the inmate commissary fund could be used to purchase religious items for the inmate population. Coleman then filed a regular grievance, which was rejected by Catherine Turner, the Grievance Coordinator at Pocahontas, on the ground that Coleman was not personally affected by the expenditure. This denial was upheld by Robert Bivens, Regional Ombudsman for the Western Region, thereby exhausting Coleman's grievance on this issue.

I find that Coleman's § 1983 claim alleging an Establishment Clause violation cannot survive the defendants' Motion because he has failed to show that any state or federal funds were used to purchase the Islamic books at issue. Instead, it is funds garnered from inmates, prison staff and prison visitors from the inmate commissary fund that were used to ultimately purchase those books. That being the case, I recommend that the court grant the defendants' Motion on Coleman's § 1983 claim alleging an Establishment Clause violation. Additionally,

---

[12] The inmate commissary fund is comprised of 6% of Keefe's profits, which Keefe gives to the VDOC in return for the VDOC prohibiting inmates from ordering anything Keefe sells from any other source.

because Coleman has not shown that the defendants have violated any clearly established law, I also recommend that the court find that the defendants are entitled to qualified immunity on this claim, as well.

### h. *Employment of Protestant Chaplains*

Coleman also argues that the expenditure of state and federal money by the VDOC to employ Protestant chaplains, through Chaplain Services of the Churches of Virginia, Inc., violates the Establishment Clause. Coleman alleges that this expenditure by the state to support and teach the Protestant religion represents a union of church and state in violation of the Establishment Clause. He further contends that OP 841.3 places contracted Protestant chaplains in a position of administrative authority over him, a Muslim, and, therefore, also violates the Establishment Clause. Coleman argues that Chaplain Richardson has utilized OP 841.3 to promote his own Protestant beliefs and to suppress and impair Coleman's beliefs and his exercise thereof.

As stated earlier, in order to demonstrate a violation of the Establishment Clause, courts use the three-part *Lemon* test. Coleman must show that the practice in question has a religious purpose, that the practice's primary purpose is to advance or inhibit religion or that the practice fosters an "excessive government entanglement with religion." *Gray v. Johnson*, 436 F. Supp. 2d 795, 799 (W.D. Va. 2006). The first prong of the *Lemon* test requires the court to inquire "whether the government's actual purpose is to endorse or disapprove of religion." *Wallace*, 472 U.S. at 56. However, the First Amendment "does not compel the government to purge from the public sphere all that in any way partakes of the religious." *Van Orden v. Perry*, 545 U.S. 677, 699 (2005) (Breyer, J., concurring). Therefore, the

-49-

governmental action fails the *Lemon* test only if the action is "entirely motivated by a purpose to advance religion." *Wallace*, 472 U.S. at 56.

I find instructive the Second Circuit case of *Katcoff v. Marsh*, 755 F.2d 223 (2nd Cir. 1985), which tackled the issue of whether the military chaplaincy program violated the Establishment Clause. In *Katcoff*, the court noted that when viewed in a vacuum, the chaplaincy program within the military violated the *Lemon* test because "its immediate purpose is to promote religion by making it available, albeit on a voluntary basis," to military personnel. 755 F.2d at 232 (finding military chaplaincy program constitutional). I find here, like the Second Circuit found in *Katcoff*, the immediate purpose of the chaplaincy program within the VDOC is to advance the practice of religion. However, as the court noted in *Katcoff*, "neither the Establishment Clause nor statutes creating and maintaining the [VDOC] chaplaincy may be interpreted as if they existed in a sterile vacuum." 755 F.2d at 232. No single test will meet all contexts, and the Establishment Clause must be interpreted to "accommodate other equally valid provisions of the Constitution, including the Free Exercise Clause, when they are implicated." *Katcoff*, 755 F.2d at 233 (citing *Marbury v. Madison*, 5 U.S. 1 (1 Cranch) 137 (1803)); *see also Zorach v. Clauson*, 343 U.S. 306 (1952) (upholding school released time program for religious instruction outside city's school system). Unless the VDOC provided a chaplaincy, inmates would be deprived of their rights under the Establishment Clause not to have religion inhibited and of their right under the Free Exercise Clause to practice their religion freely. *See Walz v. Tax Commission of City of N.Y.*, 397 U.S. 664, 669-70 (1970) ("Each value judgment under the Religion Clauses must … turn on whether particular acts in question are intended to establish or interfere with religious beliefs and practices or have the effect of doing so."). Justice Brennan in his concurrence in *Abington Sch. Dist. v.*

-50-

*Schempp*, 374 U.S. 203, 296 (1963) stated as follows:

> There are certain practices, conceivably violative of the Establishment Clause, the striking down of which might seriously interfere with certain religious liberties also protected by the First Amendment. Provisions for churches and chaplains at military establishments for those in the armed services may afford one such example. The like provision by state and federal governments for chaplains in penal institutions may afford another example. It is argued that such provisions may be assumed to contravene the Establishment Clause, yet be sustained on constitutional grounds as necessary to secure to the members of the Armed Forces and prisoners those rights of worship guaranteed under the Free Exercise Clause. Since government has deprived such persons of the opportunity to practice their faith at places of their choice, the argument runs, government may, in order to avoid infringing the free exercise guarantees, provide substitutes where it requires such persons to be.

The Second Circuit in *Katcoff* found that the purpose and effect of the program was to make religion, religious education, counseling and religious facilities available to military personnel and their families under circumstances where the practice of religion would otherwise be denied as a practical matter to all or a substantial number. *See* 755 F.2d at 237. Here, Cei testified that the VDOC has a contractual relationship with Chaplain Services to provide services including, but not limited to, formal worship, religious education, pastoral counseling, pastoral care and coordination of religious volunteers in the VDOC facilities for all faiths. (Cei Affidavit at 2.) He testified that on April 1, 2011, Chaplain Services subcontracted with Muslim Chaplain Services to provide services including, but not limited to, formal Muslim worship, religious education, pastoral counseling and VDOC-approved materials needed to provide Muslim faith-based services to the VDOC as follows: administration (correspondence); on-site Jumu'ah services

-51-

and religious counseling; and VDOC-approved Qur'ans and religious publications. (Cei Affidavit at 2-3.) Cei testified that the chaplains also provide "general support" such as arranging space and time for services, obtaining publications, etc. for all denominations. (Cei Affidavit at 3.) He stated that the chaplains from Chaplain Services (other than those from Muslim Chaplain Services) are Protestant Christians, but that does not affect their position as institutional facilitator for religious programming for offenders within the VDOC. (Cei Affidavit at 3.) Cei testified that the VDOC funds these representatives from the commissary funds only, stating that there is no state or federal money used for these services. (Cei Affidavit at 3.)

Likewise, the defendants have stated in their brief that no state or federal funds are being used to pay the institutional chaplains, but the entire funding is being achieved through commissary funds. The defendants also reiterated Cei's statement that the role of the institutional chaplain is to facilitate all faiths and their worship practices. The defendants also stated that the fact that Chaplain Services consists of various Protestant clergy does not change its duty to provide multi-denominational and multi-faith services, including formal worship, religious education, pastoral counseling, pastoral care and coordination of religious volunteers to assist at the various prisons. They contend that since none of this favors a specific religion, but facilitates all religious faiths, there is no establishment of any one religion. I agree.

It is for all of these reasons, and the reasoning relied on by the Second Circuit set forth in *Katcoff*, that I find that the Chaplaincy program in the VDOC does not violate the Establishment Clause, and I recommend that the court grant the defendants' Motion regarding the same.

### i. *Claims Against Chaplain Richardson*

Coleman next raises several claims against Chaplain Richardson. Specifically, he claims that Richardson: (a) refused to provide internet articles for Muslims while doing so for inmates of other religions; (b) acquired religious items for some religions but not others; (c) refused to maintain a discretionary fund for the Chaplain's library as outlined in OP 841.3, "Offender Religious Programs;" (d) refused to allow Coleman to act as the liason for the Islamic offenders at Pocahontas, preventing him from carrying out a religious duty; (e) retaliated against Coleman for filing grievances against him; and (f) violated the Eid-ul-Adha prayer by scheduling it in a place with pictures. Coleman alleges that these actions violated his rights to freely exercise his religion under the First Amendment and RLUIPA and violated his right to equal protection.

### 1. *Internet Articles*

First, Coleman argues that Richardson violated his right to equal protection because he refused to print requested Muslim internet articles for him, although he did so for other religious groups. Richardson testified by affidavit that he printed internet articles for other religious groups that were not large enough to meet as a group, and that the Muslims were a large enough group to meet, and they do so weekly. (Att. 5 to Docket Item No. 38, ("Richardson Affidavit"), at 2.) He admitted that, at one time, he was printing articles for Muslim inmates, but he had to bypass a security set-up on his computer to do so. (Richardson Affidavit at 2.) Richardson testified that he was not comfortable continuing to access a site that was deemed a security risk by the VDOC and, therefore, he discontinued printing

-53-

the articles. (Richardson Affidavit at 2.) He stated that he typically refers all offenders to the library for religious materials. (Richardson Affidavit at 2.)

I find that Coleman has failed to sufficiently state an equal protection claim against Richardson because he has failed to show that he was being treated differently from others with whom he is similarly situated. Robinson testified that the groups for whom he printed internet articles were groups that were not large enough to meet as a group, thereby differentiating them from the Muslims. Also, Coleman does not specify a group for whom Richardson printed internet articles. He only suspects that Richardson printed articles for Christian groups, but asks the court for certain discovery to further explore this suspicion.[13] Even assuming Coleman could show he, as a Muslim, was similarly situated with such Christian groups, he bears the burden of showing that he was being treated differently from them, and he has failed to do so. Thus, I recommend that the court grant the defendants' Motion on Coleman's § 1983 claim alleging that Richardson violated his right to equal protection. Accordingly, I also recommend that the court find that the defendants are entitled to qualified immunity on this claim.

Coleman also argues that Richardson's refusal to print Muslim internet articles was in retaliation for Coleman filing grievances against him. Coleman does not elaborate on this argument, and it appears this is nothing more than speculation on Coleman's part. In his affidavit, Chaplain Richardson testified that he is aware that part of his job includes assisting offenders who complain or disagree with his methods, and he does not retaliate against them because they disagree or file grievances. (Richardson Affidavit at 3.) He stated that he assures

---

[13] In any event, Coleman has since been transferred to a different facility; therefore, he has been removed from the challenged practice, and the issue is now moot.

-54-

equal status and protection for all VDOC-approved religions, and he does not give preferential treatment to any offender or group of offenders based on their religious beliefs and practices. (Richardson Affidavit at 2.) To state a § 1983 retaliation claim, "plaintiff [] must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994). The plaintiff must allege specific facts to support his allegation that adverse actions were retaliatory. Bare allegations of retaliation do not establish a claim rising to the level of a constitutional nature. *See Adams*, 40 F.3d at 74-75. The plaintiff must present specific evidence "establish[ing] that but for the retaliatory motive the complained of incident … would not have occurred." *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995). The plaintiff must also demonstrate that he suffered some adverse impact or actual injury. *See ACLU of Md., Inc. v. Wicomico County, Md.*, 999 F.2d 780, 785 (4th Cir. 1993.) The *Adams* court also noted that claims of retaliation must be regarded with skepticism because "[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct." 40 F.3d at 74. For these reasons, I recommend that the court grant the defendants' Motion on Coleman's retaliation claim. Accordingly, I also recommend that the court find that the defendants are entitled to qualified immunity on this claim.

## 2. *Discretionary Fund*

Next, Coleman argues that Chaplain Richardson violated his rights under the First Amendment and RLUIPA, as well as his equal protection rights by refusing to maintain a discretionary fund that would enable him to acquire required learning material for the Chaplain's library, while Richardson solicited materials for the

-55-

Protestant groups at Pocahontas. Pursuant to OP 841.3, "A Chaplain's discretionary fund is authorized, but not required, at each facility." (Richardson Affidavit at 2.) Richardson testified that he and Warden Young agreed not to have the discretionary fund, and Richardson stated that he did not feel comfortable handling money. (Robinson Affidavit at 2-3.) He further testified that if offenders contribute money for their specific religion and that particular group no longer meets, for whatever reason, the funds cannot be used for other religions, so the money sits unused. (Robinson Affidavit at 3.) As the defendants argue in their brief, I find that Coleman has not sufficiently shown how the decision to not establish a discretionary fund was a substantial burden on the free exercise of his religion. All Coleman states is that it prevented him from acquiring required learning materials for the Chaplain's library. However, there are other ways that materials may be obtained for the Chaplain's library. Richardson testified that he has a very close working relationship with Muslim Chaplain Services and continually asks them for materials. (Richardson Affidavit at 3.) He also testified that Muslim Chaplain Services provides him with books, articles, and the like. (Richardson Affidavit at 3.) All of this being the case, I recommend that the court grant the defendants' Motion on Coleman's § 1983 claim alleging a violation of the First Amendment and a statutory violation of RLUIPA related to the Chaplain's refusal to establish a discretionary fund. Furthermore, because a discretionary fund was not established for any religion, I also find that Coleman has failed to sufficiently make out a § 1983 claim based on an equal protection violation, and I recommend that the court grant the defendants' Motion on this claim as well. Accordingly, because Coleman has failed to show that the defendants violated any clearly established law related to these claims, I also recommend that the court find that the defendants are entitled to qualified immunity with regard thereto.

### 3. Religious Items

Next, Coleman argues that Chaplain Richardson purchased religious items for other religious groups, but did not do so for the Muslim inmates. Again, as just stated, Richardson testified that he has a very close working relationship with Muslim Chaplain Services, continually asks them for materials and receives items like books and articles from them. (Richardson Affidavit at 3.) Again, Coleman fails to elaborate on this argument, and the court will not attempt to construct any argument for him. However, even viewing the facts in the light most favorable to Coleman, I find that Coleman has failed to sufficiently state any claim against Richardson on this conclusory allegation, and I recommend that the court grant the defendants' Motion on this claim.

### 4. Liason/Secretary Position

Next, Coleman argues that Richardson violated his First Amendment right to freely exercise his religion by refusing to accept him as the liason/secretary chosen by the Islamic practitioners at Pocahontas, which prevented him from carrying out a religious duty. Coleman states that he sincerely believes that the most qualified person has a religious duty, in Islam, to carry out an appointed task. When, on August 24, 2010, the inmate assigned to secretary duties for the Muslim Community at Pocahontas was transferred to another facility, Coleman submitted a Request for Service form to Richardson informing him that he was the newly elected secretary by the Muslims. Coleman contends that the Qur'an orders Muslims to conduct their affairs by mutual consultation, and the Muslims mutually appointed Coleman as the secretary at that time. Therefore, Coleman argues that it

was obligatory for him to religiously carry out that duty. I first find that Coleman has sufficiently shown a sincerely held religious belief that Muslims conduct their affairs by mutual consultation and that the most qualified person has a religious duty to carry out a given task. However, I find that Richardson's refusal to accept Coleman as the liason/secretary for the Islamic practitioners at Pocahontas did not substantially burden the free exercise of his religion. Coleman does not claim that his failure to be named the self-described liason/secretary resulted in the loss of any type of benefit or pressured him to modify his behavior. For instance, his failure to be named the liason/secretary did not result in an inability to attend worship services, nor did it prevent him from actively practicing his religion as any other Muslim inmate would at Pocahontas.

Given the finding that there was no substantial burden on Coleman's free exercise of his religion, I find it unnecessary to delve into any further First Amendment analysis, and I recommend that the court grant the defendants' Motion on this claim. Accordingly, I also recommend that the court find that the defendants are entitled to qualified immunity as a reasonable person in Chaplain Richardson's position would not have known that failure to name Coleman the liason/secretary for the Islamic practitioners at Pocahontas would have violated his right to freely exercise his religion, based on Coleman's allegations that Muslims conduct their affairs by mutual consultation, and Coleman had been mutually appointed as the secretary by the Muslim practitioners at Pocahontas.

### 5. Eid-ul-Adha Meal & Prayer

Coleman also argues that Chaplain Richardson violated his right to freely exercise his religion under RLUIPA by scheduling the 2010 Eid-ul-Adha meal and

prayer in a location with pictures, which is illegal in Islam. Eid-ul-Adha is the second feast after Ramadan. (Richardson Affidavit at 3.) Coleman states that he sincerely believes that he must attend and properly perform the prayer of Eid-ul-Adha every year, and he sincerely believes that a Muslim is not permitted to pray where pictures are displayed. However, Coleman alleges that the chow hall where the meal and prayer were held contained pictures. Chaplain Richardson testified that he was not present at Pocahontas at the time of the 2010 Eid-ul-Adha meal and prayer, but if he had been, he would have removed the pictures before the meal.[14] (Richardson Affidavit at 3-4.) He testified that the failure to remove the pictures was nothing more than an oversight by facility staff, and was not done intentionally. (Richardson Affidavit at 4.)

Even assuming that Coleman can show that his religion was substantially burdened by the scheduling of the Eid-ul-Adha meal and prayer in a location with pictures, any claims for declaratory or injunctive relief to this issue are moot because he has been transferred to another correctional facility and has, therefore, been removed from the challenged practice. *See Incumaa*, 507 F.3d at 286-87; *see also Williams*, 952 F.2d at 823. That leaves the possibility for Coleman to receive only monetary damages on this claim. However, because he raises only a statutory violation of RLUIPA, the only monetary damages even potentially available are individual capacity damages, but only if Coleman has advanced facts suggesting that the challenged action affected interstate commerce. *See Shabazz*, 2012 WL 463562, at *10. Coleman advances no such facts. That being the case, I recommend that the court grant the defendants' Motion on this claim.

---

[14] Richardson testified that, although there was no requirement to do so, he would have removed the pictures as a courtesy to the Muslim offenders, and he apologized to them for the oversight. (Richardson Affidavit at 4.)

Accordingly, I find that the defendants are entitled to qualified immunity on this claim as well.

### j. Failure to Recognize Salafi Muslims Within the VDOC

In January 2009, Coleman submitted a Request for DOC Recognition of Religious Group form to the FRC, headed by Cei, seeking recognition of the Salafi Muslim group. Pursuant to OP 841.3, "Offender Religious Programs," "[o]ffender requests for new religious groups or activities not currently recognized by the DOC shall be submitted on a *Request for Recognition of Religious Group*, … to the Facility Unit Head or designee who shall be a DOC employee. … The Facility Unit Head shall review the *Request for Recognition of Religious Group*. … [T]he Facility Unit Head shall indicat[e] [a] recommendation to approve or disapprove the *Request for Recognition of Religious Group*. … The Facility Unit Head will refer the request and supporting documentation to the *Faith Review Committee* for recommendation to the Chief of Corrections Operations. … The Chief of Corrections Operations shall make the final decision to add a proposed religious group to *Religions Approved to Operate in DOC Facilities* based on information presented. (Att. 5 to Docket Item No. 38, ("OP 841.3"), at 12.) The "Purpose" section of OP 841.3 states as follows: "This [OP] establishes protocols to provide reasonable opportunities for offenders incarcerated in [DOC] facilities to voluntarily pursue religious beliefs and practices subject to concerns regarding facility security, safety, order, space, and resources. The [DOC] shall give no preference to the activities of one religious denomination, faith, or sect over another." (OP 841.3 at 5.)

Coleman's request was disapproved because, it was determined, through

-60-

research, that the group's needs could be met with the Sunni Muslim group, a religion already recognized within the VDOC. (Cei Affidavit at 3.) In particular, it was determined that Salafi Islam was not a separate religion or denomination from Sunni Islam, but simply a school of thought or emphasis within it. (Cei Affidavit at 3.) It was determined that, while Salafi Muslims could still interpret the Qur'an and other teachings as they preferred, their worship and prayer needs were met by the existing Sunni group. (Cei Affidavit at 3.) However, Coleman claims that the defendants mischaracterized this worship group as a Sunni group. He claims, instead, that Pocahontas had one Islamic service that contained Shia, Sunni and World Community practitioners. Coleman alleges that the Shia are not Sunni, and the World Community is a racist splinter group of the Nation of Islam that promotes black nationalism in the name of Islam. He states that he is ordered by Allah not to sit with "deviants" or to take knowledge from them. Citing to the Prophet Muhammad, he also states that Muslims are prohibited from sitting with "innovators" like members of the World Community. The defendants do not challenge that Coleman sincerely holds these religious beliefs, and I find that he has sufficiently stated the same. Likewise, I find that the failure to recognize Salafi Islam as a separate religion within the VDOC places a substantial burden upon the free exercise of his religion because it forces him to choose between disavowing a sincerely held religious belief by sitting with "deviants" and "innovators" or forgoing congregate worship services altogether. Given the finding of a substantial burden, under RLUIPA, the defendants must show that there is a compelling governmental interest that is furthered by the procedure for approving new religions within the VDOC. For the following reasons, I find that the defendants have failed to meet this burden.

Cei did not address in his affidavit any interest, let alone a compelling one,

for having a procedure for approving new religions within the VDOC. Likewise, in their brief, the defendants say only that recognizing different groups requires different meeting times and places, and the VDOC must conserve valuable staff and physical resources for the already abundant religious groups. They further argue that where there is no need to separate the groups, such as with the Salafi and the Sunni groups, it is reasonable to keep them combined. While OP 841.3 contains the blanket statement of purpose, i.e. "to provide reasonable opportunities for offenders … to voluntarily pursue religious beliefs and practices subject to concerns regarding facility security, safety, order, space, and resources[,]" I find that such a blanket statement is not sufficient under *Couch*. Given the lack of affidavit testimony regarding any compelling governmental interest for having a procedure for approving new religions within the VDOC, the lack of any meaningful argument in the defendants' brief meeting the *Couch* requirements for meeting this burden and the insufficient blanket statement contained in OP 841.3, I find that the defendants have failed to make the requisite showing of a compelling governmental interest and, I, therefore, recommend that the court deny the defendants' Motion on Coleman's claim alleging a statutory violation of RLUIPA on this ground.

As for the *Turner* factors, I find that the defendants have stated a valid, rational connection between the policy for recognizing new religions within the VDOC and security, safety, order, space and the conservation of limited prison resources. For instance, such conservation dictates that the FRC determine when the needs of a group seeking recognition can reasonably be met by an already existing group within the VDOC. I find that the first factor weighs in favor of the defendants. Next, I find that the Salafi Muslims have alternative means of exercising their religion at Pocahontas despite not being recognized as a separate

group within the VDOC. For instance, they still may engage in all the religious activities available to any other inmate at Pocahontas, including viewing religious television programming, praying in their cells at any time they choose and acquiring religious materials from the Chaplain's library. Thus, I find that this factor also weighs in favor of the defendants. Next, as already stated, accommodating Coleman's request could have a negative impact on limited prison resources because separate meeting space would be required, a separate time for the worship service would be required, additional services would require an additional movement of inmates, and additional movement of inmates can create additional security concerns. Therefore, I find that this factor also weighs in favor of the defendants. Lastly, I find that there is no obvious, easy alternative to the denial of Coleman's request. Coleman suggests approving the recognition of the Salafi group to see how many offenders sign up for it at each institution. He suggests that if five or more offenders sign up, then they should be afforded the opportunity to worship in their own way like every other group. However, the court has difficulty seeing how Coleman's suggested alternative relates to the FRC's reasoning that the Salafi Muslims' needs can be met by the already recognized Sunni Muslims. In any event, giving Coleman the benefit of the doubt and assuming that there is an obvious alternative, three of the four *Turner* factors still weigh in favor of the defendants. Additionally, because it is Coleman who bears the burden of disproving the validity of the procedure, and because the court must respect the determinations of prison officials, I recommend that the court grant the defendants' Motion with regard to Coleman's § 1983 claim alleging a First Amendment violation related to the FRC's denial of recognition of the Salafi Muslims as a separate group within the VDOC.

I also find that defendants Cei and the FRC are entitled to qualified

immunity on Coleman's claim that they violated his rights to freely exercise his religious rights by denying his request for recognition of Salafi Islam within the VDOC. More specifically, I find that a reasonable person in Cei's and/or the FRC's position would not know that utilizing the procedure set forth in OP 841.3 to deny Coleman's request that Salafi Islam be approved as a separate religion within the VDOC would violate his right to freely exercise his religion. There is no Supreme Court, Fourth Circuit or Virginia Supreme Court case law disfavoring or prohibiting the use of such a procedure for determining whether a religion should be approved and, as stated numerous times herein, such interests as institutional security and conservation of facility space and manpower are weighed against the reasonable need for the request. The court will give due deference to these decisions. It is for these reasons that I recommend that the court find that defendants Cei and the FRC are entitled to qualified immunity on Coleman's claim that his right to freely exercise his religion was violated.

Coleman also argues that the FRC's denial of recognition of the Salafi Muslims as a separate group within the VDOC violates the Establishment Clause because it forces him to attend what the defendants improperly describe as the "Sunni" service as the price of attending congregate worship services. I find Coleman's argument must fail because there simply is no evidence that Cei and/or the FRC's intent was to promote or advance any type of Islam, whether it be Sunni Islam, Shia Islam or World Community Islam. Instead, the one Islamic service was available at Pocahontas, and Coleman could attend if he wished to do so. As the defendants state in their brief, by utilizing a procedure by which some religions are approved and some are not, Cei and the FRC are attempting to accommodate the religious practices of prisoners, but it does not establish a preference for one religion over another. Therefore, I recommend that the court grant the defendants'

Motion on Coleman's § 1983 claim alleging a violation of the Establishment Clause related to Cei's and the FRC's failure to recognize Salafi Islam as a separate religion within the VDOC. Accordingly, I also recommend that the court find that the defendants are entitled to qualified immunity on this claim, as Coleman has failed to show that the defendants' actions violated any clearly established law.

Coleman further argues that the denial of recognition of Salafi Islam within the VDOC violates the Equal Protection Clause, noting that Cei and the FRC recognize 21 different sects of Protestant Christianity. Even assuming that Coleman could show that the Salafi Muslims are being treated differently from others with whom they are similarly situated, he has failed to show that such unequal treatment is the result of intentional or purposeful discrimination. Simply stating that 21 sects of Protestant Christianity are recognized within the VDOC does not sufficiently show an intent to discriminate. *See Morrison*, 239 F.3d at 654. As stated previously, mere conclusory allegations of discrimination are insufficient, as are mere conclusory allegations of disparities. *See Spaulding*, 1990 U.S. App. LEXIS 15560, at *2; *Chapman*, 378 F. Supp. at 1139-40. That being the case, I recommend that the court grant the defendants' Motion on Coleman's equal protection claim as it pertains to the failure to recognize Salafi Islam as a separate religion within the VDOC. Accordingly, I recommend that the court find that the defendants are entitled to qualified immunity on this claim.

Coleman also argues that the failure to recognize Salafi Islam, while recognizing 21 sects of Protestant Christianity, violates the Privileges and Immunities Clause. He also states that the Privileges and Immunities Clause is violated by having to attend the one Islamic service if he wishes to attend

Case 7:11-cv-00518-SGW-PMS   Document 57   Filed 12/26/12   Page 65 of 84   Pageid#: 771

congregate worship services at Pocahontas. Coleman does not flesh these arguments out any further, and while the court must liberally construe Coleman's pleadings, *see Haines*, 404 U.S. 519, the court is not required to formulate Coleman's arguments for him. I find that Coleman simply has not pleaded sufficient facts to state a Privileges and Immunities violation, and I recommend that the court grant the defendants' Motion on this claim.

### k. Fast of Ashura

Lastly, Coleman also argues that Cei and the FRC violated his right to freely exercise his religion under the First Amendment and RLUIPA by failing to authorize the Fast of Ashura as a Muslim holy day and ordering Pocahontas to accommodate it. Although Coleman raised this argument in his Original Complaint and incorporated it by reference into the Amended Complaint, the defendants have failed to address it. That being the case, I find that granting summary judgment in their favor is inappropriate at this time and I, therefore, recommend that the court deny the defendants' Motion on this claim. Granting or denying qualified immunity also is inappropriate at this time for the same reasons.

### l. Interference with Attempts to Exhaust Claims

Coleman argues that defendant Catherine Turner, the Grievance Coordinator at Pocahontas, and a Christian, refused to substantively address his grievances regarding the CD Policy and the Grooming Policy at issue in this case in retaliation for his filing of grievances against Chaplain Richardson, also a Christian. As stated previously, in order to state a § 1983 retaliation claim, "plaintiff [] must allege either that the retaliatory act was taken in response to the exercise of a

-66-

constitutionally protected right or that the act itself violated such a right." *Adams*, 40 F.3d at 75. The plaintiff must allege specific facts to support his allegation that adverse actions were retaliatory. Bare allegations of retaliation do not establish a claim rising to the level of a constitutional nature. *See Adams*, 40 F.3d at 75. The plaintiff must present specific evidence "establish[ing] that but for the retaliatory motive the complained of incident … would not have occurred." *Woods*, 60 F.3d at 1166. The plaintiff must also demonstrate that he suffered some adverse impact or actual injury. *See ACLU of Md., Inc.,* 999 F.2d at 785. It is well-settled that inmates do not have a constitutional right to a prison grievance procedure. *See Adams,* 40 F.3d at 75 (citing *Flick v. Alba,* 932 F.2d 728 (8th Cir. 1991). Therefore, their utilization of an existing grievance procedure does not constitute the exercise of a federally protected right so as to support a § 1983 retaliation claim. *See Adams*, 40 F.3d at 75.

Coleman's allegations do not satisfy the necessary elements of the retaliation claim he seeks to bring here. In using the grievance procedure, he was not exercising a constitutionally protected right. Coleman also fails to describe a causal connection between filing grievances against Chaplain Richardson and Turner's failure to substantively address his grievances pertaining to the CD Policy and the Grooming Policy. Instead, it appears that he relies on the fact that certain events followed certain other events, and he fails to establish any retaliatory motive. Additionally, Coleman does not describe any adverse impact or actual injury, as the defendants do not contest that he has exhausted these issues, and he has not been prevented from raising these claims in the suit currently pending in this court. Therefore, I recommend that the court grant the defendants' Motion on Coleman's retaliation claim as it pertains to Turner's interference with his attempts to exhaust his claims regarding the CD Policy and the Grooming Policy.

-67-

Accordingly, I recommend that the court find that the defendants are entitled to qualified immunity, as well, as Coleman has failed to show that they violated any clearly established law.

Coleman also argues that his right to equal protection has been violated because he was treated differently than another inmate with whom he was similarly situated when Turner did not substantively respond to grievances regarding the CD Policy and the Grooming Policy, instead rejecting them as untimely, but did so for another inmate. Coleman has submitted evidence showing that defendant Turner returned a Regular Grievance filed by Coleman on October 25, 2010, regarding the CD Policy due to "Expired Filing Period," noting that the policy had been effective since April 2010. Coleman appealed Turner's decision to the next level, and the decision was upheld by Robert Bivens, the Regional Ombudsman. Coleman exhausted this claim. Coleman also has submitted evidence that Turner accepted and responded to an Informal Complaint regarding the CD Policy from inmate Ronnie Warner, dated October 24, 2010, and a Regular Grievance dated November 5, 2010. Coleman also submitted an Informal Complaint on October 7, 2010, and Regular Grievance on October 25, 2010, regarding the Grooming Policy. Turner again returned the grievance on October 28, 2010, due to "Expired Filing Period," because the policy had been effective since June 2007. Again, however, the same inmate submitted an Informal Complaint on October 25, 2010, and a Regular Grievance on November 5, 2010. Turner accepted the Grievance and issued Warner a receipt therefor. Warner's Grievance was ultimately deemed unfounded.

The defendants have offered no explanation for this discrepancy. However, it is Coleman's burden to show that he was treated differently from someone with whom he was similarly situated and that the reason for the disparate treatment was

Case 7:11-cv-00518-SGW-PMS   Document 57   Filed 12/26/12   Page 68 of 84   Pageid#: 774

purposeful or intentional discrimination. *See Morrison*, 239 F.3d at 654. Even assuming that Coleman has sufficiently shown that he was treated differently from someone with whom he was similarly situated, I find that he has not made the requisite showing of purposeful or intentional discrimination. Instead, Coleman speculates from the different treatment itself that he was discriminated against by Turner. That being the case, I recommend that the court grant the defendants' Motion on Coleman's § 1983 claim alleging an equal protection violation related to the filing of his grievances concerning the CD Policy and the Grooming Policy. Accordingly, I also recommend that the court find that the defendants are entitled to qualified immunity, as Coleman has failed to establish that they violated clearly established law.

## m. Law Library Job

Next, Coleman argues that defendant Hammond refused to hire him for an open position in the law library in retaliation for filing complaints against Chaplain Richardson. As stated above, to state a § 1983 retaliation claim, "plaintiff must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." *Adams*, 40 F.3d at 75. The plaintiff must allege specific facts to support his allegation that adverse actions were retaliatory. Bare allegations of retaliation do not establish a claim rising to the level of a constitutional nature. *See Adams*, 40 F.3d at 75. Inmates do not have a constitutional right to a prison job and, therefore, the deprivation of a prison job states no independent constitutional claim. *See Bulger v. U.S. Bureau of Prisons*, 65 F.3d 48, 50 (5th Cir. 1995); *Moody v. Daggett*, 479 U.S. 78, 88 n.9 (1976); *Altizer v. Paderick,* 569 F.2d 812, 813 (4th Cir. 1978).

Coleman's allegations do not satisfy the necessary elements of the retaliation claim he seeks to bring here. Because he has no constitutionally protected right to a prison job, defendant Hammond's failure to choose Coleman for the open library position does not amount to a constitutionally significant deprivation. Moreover, his allegation that Hammond's failure to choose him for the job was retaliatory is merely conclusory. For instance, there is no evidence that Hammond ever made any statements to Coleman or anyone else that would lead one to believe he had any improper motive for failing to hire Coleman for the law library job. Additionally, there is no logical connection between the grievances filed against Chaplain Richardson and Coleman's failure to be hired for the law library job. In short, Coleman has supplied no evidence linking Hammond's decision not to hire him for the job to his filing of grievances against Chaplain Richardson. For all of these reasons, I recommend that the court grant the defendants' Motion on Coleman's retaliation claim on this issue. Accordingly, because Coleman has failed to show that the defendants violated any clearly established law, I recommend that the court find that they are entitled to qualified immunity on this issue.

### n. Access to Courts

Lastly, Coleman argues that Hammond and Warden Young attempted to impede his access to the courts by upholding a ruling by a counselor to charge 50 cents per page for legal copies when the proper charge should have been 25 cents. Apparently, Coleman was charged 50 cents for photocopying of double-sided legal materials -- 25 cents per side -- when the appropriate charge should have been 25 cents per entire page, regardless of how many sides were photocopied. Coleman states that he had to appeal their decision to the Regional level to get it overturned.

It is well-settled that prisoners have a fundamental right to "adequate, effective, and meaningful" access to the courts. *Bounds v. Smith*, 430 U.S. 817, 822 (1977). To prove that a prisoner has been denied this right, a prisoner must show that he has suffered an "actual injury" because of the restrictions imposed upon him. *Strickler*, 989 F.2d at 1383. The requirement of an "actual injury" means the deprivation of legal materials "actually prevented [plaintiff] from meeting deadlines, or otherwise prejudiced him in any pending litigation, or actually impeded his access to the courts." *Oswald v. Graves*, 819 F. Supp. 680, 683 (E.D. Mich. 1993). Coleman has not alleged that he missed any court deadlines or that he has actually been impeded in any way pertaining to access to the courts by being overcharged for legal copies. As the defendants emphasize in their brief, the erroneous determination to charge 50 cents per two-sided page was overturned, Coleman was refunded the amount of money that he was overcharged, and it is obvious that Coleman has now successfully brought his claims to federal court. All of this being said, Coleman has failed to show any "actual injury" necessary to make a claim for interference with access to the courts, and I recommend that the court grant the defendants' Motion on Coleman's claim pertaining thereto.

I also recommend that the court find that the defendants are entitled to qualified immunity on this claim. While a prisoner's right to "adequate, effective, and meaningful" access to the courts was "established beyond doubt" approximately 35 years ago, *see Bounds*, 430 U.S. at 821-22, I find that reasonable officials in Hammond's and Warden Young's positions would not have known that upholding the counselor's decision to charge 50 cents for two-sided legal copies (25 cents per side) violated clearly established statutory or constitutional rights. Furthermore, the undisputed evidence shows that this erroneous determination was overturned, and Coleman was reimbursed the funds that he was overcharged.

-71-

Also, Coleman clearly has not been precluded from filing suit in this court.

## PROPOSED FINDINGS OF FACTS AND
## CONCLUSIONS OF LAW

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.  RLUIPA does not authorize damages against officials in their official capacities;

2.  The court should grant summary judgment in the defendants' favor on Coleman's claims under RLUIPA for damages against the defendants in their official capacities;

3.  The Spending Clause does not provide a basis for individual capacity damages under RLUIPA;

4.  Coleman has advanced facts suggesting the CD Policy, the single commissary vendor policy and the food service policy affect interstate commerce;

5.  The court should grant summary judgment in the defendants' favor on Coleman's RLUIPA claims for money damages against the defendants in their individual capacities except for Coleman's claims regarding the CD Policy, the single commissary vendor policy and the food service policy;

6.  The VDOC is not a person under § 1983;

7.  The court should grant summary judgment in favor of VDOC on Coleman's § 1983 claims against it;

8.  The defendants are immune from suit under § 1983 in their official capacities from monetary damages;

9.  The court should enter summary judgment in the defendants' favor on

-72-

Coleman's claims against them for damages under § 1983 in their official capacities;

10.     There is no genuine issue of material fact, and the evidence shows that the CD Policy furthers the compelling governmental interest of institutional security;

11.     The defendants have failed to present evidence that the CD Policy is the least restrictive means of achieving the compelling governmental interest;

12.     There is no genuine issue of material fact, and the evidence shows that the CD Policy serves a legitimate penological interest;

13.     The court should enter summary judgment in the defendants' favor based on Coleman's § 1983 claim alleging that the CD Policy violates his right to freely exercise his religion under the First Amendment;

14.     The court should enter summary judgment in the defendants' favor based on qualified immunity on Coleman's claim that the CD Policy violates his right to freely exercise his religion under both the First Amendment and RLUIPA;

15.     The court declines to construct Coleman's freedom of speech and freedom of the press arguments for him as they relate to the CD Policy;

16.     The court should enter summary judgment in the defendants' favor based on Coleman's § 1983 claim alleging that the CD Policy violates his right to freedom of speech and freedom of the press under the First Amendment;

17.     There is no genuine issue of material fact, and the evidence shows that the CD Policy does not violate the Establishment Clause of the First Amendment because it has a purely secular purpose and it does not result in an excessive entanglement between church and state;

18.     The court should enter summary judgment in the defendants' favor on Coleman's § 1983 claim alleging an Establishment Clause violation based on the CD Policy;

19.   The court should enter summary judgment in the defendants' favor on Coleman's § 1983 claim alleging a Privileges and Immunities Clause violation because there is no genuine issue of material fact, and the evidence shows that the CD Policy is enforced against citizens of all states alike;

20.   The court should enter summary judgment in the defendants' favor on Coleman's § 1983 claim alleging that the CD Policy violates federal antitrust laws;

21.   Coleman has failed to present evidence that the policy allowing for one, one-ounce bottle of prayer oil weekly substantially burdens his religion;

22.   The court should enter summary judgment in the defendants' favor on Coleman's § 1983 claim alleging a violation of the First Amendment and his claim alleging a statutory violation of RLUIPA insofar as they pertain to the restriction on the quantity of prayer oil;

23.   There is no genuine issue of material fact and the defendants failed to show that the use of a single commissary vendor serves a compelling governmental interest;

24.   There is no genuine issue of material fact, and the defendants have shown that the use of a single commissary vendor serves a legitimate penological interest;

25.   The court should enter summary judgment in the defendants' favor on Coleman's § 1983 claim that use of a single commissary vendor violates his rights to freely exercise his religion under the First Amendment;

26.   The court should enter summary judgment based on qualified immunity on Coleman's § 1983 claim alleging a First Amendment and RLUIPA violation related to the use of a single commissary vendor;

27.   The court should enter summary judgment in the defendants' favor on Coleman's § 1983 claim alleging a Privileges and Immunities Clause

violation because another federal court found Muslim prisoners may possess two bottles of prayer oil;

28.     The court should enter summary judgment based on qualified immunity on Coleman's claim alleging a Privileges and Immunities Clause violation based on restriction on the quantity of prayer oil;

29.     There is no genuine issue of material fact, and the evidence fails to show that the Grooming Policy is the least restrictive means of furthering a compelling governmental interest;

30.     There is no genuine issue of material fact, and the evidence shows that the Grooming Policy serves a legitimate penological interest;

31.     The court should enter summary judgment in the defendants' favor on Coleman's § 1983 claim alleging a First Amendment violation based on the Grooming Policy;

32.     The court should enter summary judgment based on qualified immunity on Coleman's § 1983 claim that the Grooming Policy violates his right to freely exercise his religion under both the First Amendment and RLUIPA;

33.     There is no genuine issue of material fact, and Coleman has failed to show that the Grooming Policy works a serious deprivation of a basic human need as required by the Eighth Amendment;

34.     There is no genuine issue of material fact, and Coleman has failed to show that the defendants were deliberately indifferent to his serious medical needs;

35.     The court should enter summary judgment in the defendants' favor on Coleman's § 1983 claim alleging that the Grooming Policy constitutes a violation of the Eighth Amendment's prohibition against the infliction of cruel and unusual punishment;

36.     The court should enter summary judgment in the defendants' favor based on qualified immunity on Coleman's § 1983 claim alleging that the Grooming Policy constitutes a violation of the Eighth Amendment;

Case 7:11-cv-00518-SGW-PMS  Document 57  Filed 12/26/12  Page 75 of 84  Pageid#: 781

37. The court should enter summary judgment in the defendants' favor on Coleman's § 1983 claim alleging a Privileges and Immunities Clause violation pertaining to the Grooming Policy because it is applied equally to all inmates who do not have a no-shave pass, regardless of their state citizenship;

38. There is no genuine issue of material fact, and Coleman has failed to show that the dress code imposes a substantial burden on his religion;

39. The court should enter summary judgment in the defendants' favor on Coleman's § 1983 claim alleging the dress code violates his rights to freely exercise his religion under the First Amendment and RLUIPA;

40. The court should enter summary judgment in the defendants' favor based on qualified immunity on Coleman's § 1983 claim alleging the dress code violates his rights to freely exercise his religion under the First Amendment and RLUIPA;

41. The court should enter summary judgment in the defendants' favor on Coleman's § 1983 claim alleging a violation of the Privileges and Immunities Clause based on the dress code because it is applied equally to all inmates regardless of state citizenship;

42. There is no genuine issue of material fact, and Coleman has failed to show that the policy prohibiting prayer in the pod substantially burdens the free exercise of his religion;

43. The court should enter summary judgment in the defendants' favor on Coleman's § 1983 claim alleging that the policy prohibiting prayer in the pod violates his rights to freely exercise his religion under the First Amendment and RLUIPA;

44. The court should enter summary judgment in the defendants' favor based on qualified immunity on Coleman's § 1983 claim alleging that the policy prohibiting prayer in the pod violates the First Amendment and RLUIPA;

45. There is no genuine issue of material fact, and Coleman has failed to show that any disparate treatment in the policy prohibiting prayer in

-76-

the pod was the result of intentional or purposeful discrimination;

46. The court should enter summary judgment in the defendants' favor on Coleman's § 1983 claim alleging an equal protection violation based on the policy prohibiting prayer in the pod;

47. The court should enter summary judgment based on qualified immunity on Coleman's § 1983 claim alleging an equal protection violation pertaining to the policy prohibiting prayer in the pod;

48. There is no genuine issue of material fact, and the defendants have failed to state a compelling governmental interest furthered by the food service policy which does not contain Halal meat;

49. The court should deny entry of summary judgment in the defendants' favor on Coleman's claim alleging that the food service policy constitutes a statutory violation of RLUIPA;

50. There is no genuine issue of material fact, and the defendants have failed to show that the food service policy is rationally related to the legitimate penological interest of cost containment;

51. The court should deny entry of summary judgment in the defendants' favor on Coleman's § 1983 claim alleging the food service policy violates the First Amendment;

52. The defendants are not entitled to qualified immunity, at this time, on the issue of whether the food service policy violates RLUIPA and/or the First Amendment;

53. The court should enter summary judgment in the defendants' favor on Coleman's § 1983 claim alleging that the food service policy violates the Privileges and Immunities Clause;

54. There is no genuine issue of material fact, and Coleman has failed to show that he suffered any serious or significant injury as a result of the food service policy;

55. The court should enter summary judgment in the defendants' favor on Coleman's § 1983 claim alleging that the food service policy violates

the Eighth Amendment's prohibition against cruel and unusual punishment;

56.    The court should enter summary judgment in the defendants' favor based on qualified immunity on Coleman's § 1983 claim alleging the food service policy violates the Eighth Amendment;

57.    There is no genuine issue of material fact, and Coleman has failed to show that any state or federal funds were used to purchase Islamic books;

58.    The court should enter summary judgment in the defendants' favor on Coleman's § 1983 claim that the expenditure of money from the inmate commissary fund to purchase religious items for the Chaplain's library violates the Establishment Clause;

59.    The court should issue summary judgment in the defendants' favor based on qualified immunity on Coleman's § 1983 claim alleging that the expenditure of money from the inmate commissary fund to purchase religious items for the Chaplain's library violates the Establishment Clause;

60.    There is no genuine issue of material fact, and Coleman has failed to show that any state or federal funds are used to pay the institutional chaplains, and the role of the institutional chaplain is to facilitate all faiths;

61.    The court should enter summary judgment in the defendants' favor on Coleman's § 1983 claim that the employment of Protestant chaplains by the VDOC violates the Establishment Clause;

62.    There is no genuine issue of material fact, and Coleman has failed to show that he was similarly situated with other groups for whom Chaplain Richardson printed internet articles because the groups for whom such articles were printed were too small to meet as a group, while the Muslims were large enough to meet as a group;

63.    The court should enter summary judgment in the defendants' favor on Coleman's § 1983 claim alleging a violation of his equal protection rights based on Richardson's refusal to print internet articles;

-78-

64. The court should enter summary judgment in the defendants' favor based on qualified immunity on Coleman's § 1983 claim alleging a violation of his equal protection rights based on Richardson's refusal to print internet articles;

65. There is no genuine issue of material fact, and Coleman has failed to show that Richardson's refusal to print Muslim internet articles was in retaliation for Coleman filing grievances against him;

66. The court should enter summary judgment in the defendants' favor on Coleman's § 1983 retaliation claim against Richardson;

67. The court should enter summary judgment in the defendants' favor based on qualified immunity on Coleman's § 1983 retaliation claim against Richardson;

68. There is no genuine issue of material fact, and Coleman has failed to show that Richardson's refusal to establish a Chaplain's discretionary fund substantially burdened his religion;

69. The court should enter summary judgment in the defendants' favor on Coleman's § 1983 claim that Richardson's refusal to establish a Chaplain's discretionary fund violates the First Amendment and his claim that it constitutes a statutory violation of RLUIPA;

70. There is no genuine issue of material fact, and the evidence shows that a discretionary fund was not established for any religious group at Pocahontas;

71. The court should enter summary judgment in the defendants' favor on Coleman's § 1983 claim alleging that Richardson's refusal to establish a Chaplain's discretionary fund violates his equal protection rights;

72. The court should enter summary judgment in the defendants' favor based on qualified immunity on Coleman's § 1983 claim alleging that Richardson's refusal to establish a Chaplain's discretionary fund violates the First Amendment, his claim that it constitutes a statutory violation of RLUIPA and his claim that it constitutes a violation of the

Equal Protection Clause;

73. Coleman failed to sufficiently develop his argument that Chaplain Richardson purchased religious items for other religious groups, but failed to do so for the Muslim inmates;

74. The court should enter summary judgment in the defendants' favor on Coleman's claim that Richardson purchased religious items for other religious groups, but failed to do so for the Muslim inmates;

75. There is no genuine issue of material fact, and Coleman has failed to show that Richardson's refusal to accept him as the liason/secretary chosen by the Islamic practitioners at Pocahontas substantially burdens his religion;

76. The court should enter summary judgment in the defendants' favor on Coleman's § 1983 claim that Richardson's refusal to accept him as the liason/secretary chosen by the Islamic practitioners at Pocahontas violates the First Amendment;

77. The court should enter summary judgment in the defendants' favor based on qualified immunity on Coleman's § 1983 claim alleging a First Amendment violation by Richardson's refusal to accept him as the liason/secretary chosen by the Islamic practitioners at Pocahontas;

78. The court should enter summary judgment in the defendants' favor on Coleman's claim that Richardson violated his statutory rights under RLUIPA by scheduling the Eid-ul-Adha meal and prayer in a location with pictures because any claims for declaratory and injunctive relief are moot, and he has failed to advance any facts suggesting the challenged action affected interstate commerce, thereby foreclosing any claim for individual capacity damages under the Commerce Clause;

79. There is no genuine issue of material fact, and defendants have failed to show that there was a compelling governmental interest for the procedure for approving new religions within the VDOC;

80. There is no genuine issue of material fact, and defendants have shown that the procedure for approving new religions within the VDOC

serves a legitimate penological interest;

81. The court should enter summary judgment in the defendants' favor on Coleman's § 1983 claim alleging that the procedure for approving new religions within the VDOC violates the First Amendment;

82. The court should enter summary judgment based on qualified immunity on Coleman's claim that they violated his right to freely exercise his religion under the First Amendment and RLUIPA by denying his request for recognition of Salafi Islam within the VDOC;

83. There is no genuine issue of material fact, and Coleman has failed to show that the intent of the FRC, in denying recognition of Salafi Islam as a separate religious group within the VDOC, was to promote or advance any type of Islam;

84. The court should enter summary judgment in the defendants' favor on Coleman's § 1983 claim alleging that the FRC's denial of the Salafi Muslims as a separate group within the VDOC violates the Establishment Clause of the First Amendment;

85. The court should enter summary judgment based on qualified immunity on Coleman's § 1983 claim alleging an Establishment Clause violation pertaining to the denial of recognition of Salafi Islam as a separate group within the VDOC;

86. There is no genuine issue of material fact, and Coleman has failed to show that any unequal treatment of the Salafi Muslims was the result of intentional or purposeful discrimination;

87. The court should enter summary judgment in the defendants' favor on Coleman's § 1983 claim that Cei and the FRC violated his right to equal protection by recognizing 21 different sects of Protestant Christianity, while failing to recognize Salafi Islam;

88. The court should enter summary judgment based on qualified immunity on Coleman's § 1983 claim alleging a violation of his equal protection rights by the refusal to recognize Salafi Islam as a separate group within the VDOC;

89. The court should enter summary judgment in the defendants' favor on Coleman's § 1983 claim that the refusal to recognize Salafi Islam as a separate group within the VDOC violates the Privileges and Immunities Clause;

90. The defendants failed to address Coleman's § 1983 claim alleging that Cei and the FRC violated the First Amendment and RLUIPA by failing to authorize the Fast of Ashura as a Muslim holy day and ordering Pocahontas to accommodate it;

91. The court should deny entry of summary judgment in the defendants' favor on this issue at this time;

92. There is no genuine issue of material fact, and Coleman has failed to establish a § 1983 retaliation claim against Turner for failing to substantively address his grievances regarding the CD Policy and the Grooming Policy;

93. The court should enter summary judgment in the defendants' favor on Coleman's § 1983 retaliation claim against Turner;

94. The court should enter summary judgment based on qualified immunity on Coleman's § 1983 retaliation claim against Turner;

95. There is no genuine issue of material fact, and Coleman has failed to show that any unequal treatment by Turner pertaining to the grievance procedure was the result of purposeful or intentional discrimination;

96. The court should enter summary judgment in the defendants' favor on Coleman's § 1983 claim alleging that Turner's failure to substantively address his grievances pertaining to the CD Policy and the Grooming Policy violates his equal protection rights;

97. The court should enter summary judgment in the defendants' favor based on qualified immunity on Coleman's § 1983 claim alleging this equal protection violation;

98. Coleman had no constitutionally protected right to a prison job;

99. There is no genuine issue of material fact, and Coleman has failed to

show a causal connection between his filing of grievances against Chaplain Richardson and his failure to obtain the law library job;

100. The court should enter summary judgment in the defendants' favor on Coleman's § 1983 retaliation claim against Hammond for failing to hire him for a job in the law library;

101. The court should enter summary judgment in the defendants' favor based on qualified immunity on Coleman's § 1983 retaliation claim related to the law library job;

102. There is no genuine issue of material fact, and Coleman has failed to show the actual injury necessary to establish a claim for interference with access to the courts;

103. The court should enter summary judgment in the defendants' favor on Coleman's § 1983 claim alleging that Hammond and Warden Young attempted to violate his right to access to the courts by upholding a ruling improperly charging 50 cents per page for legal copies instead of the appropriate 25 cent per page charge; and

104. The court should enter summary judgment in the defendants' favor based on qualified immunity on Coleman's § 1983 claim alleging that Hammond and Warden Young attempted to violate his right to access to the courts.

## RECOMMENDED DISPOSITION

Based on the above-stated reasons, I recommend that the court grant in part and deny in part the defendants' motion for summary judgment. I recommend that only Coleman's claims alleging a violation of RLUIPA and the First Amendment based on the absence of a Halal-certified diet including Halal meat and the failure to recognize the Fast of Ashura as a Muslim holy day remain.

**Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed finding or recommendation to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence to recommit the matter to the magistrate judge with instructions.

Failure to file written objection to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable Samuel G. Wilson, United States District Judge.

The Clerk is directed to send copies of this Report and Recommendation to all counsel of record and unrepresented parties.

DATED: This 26th day of December, 2012.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE