CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

AUG 13 2013

JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| JEFFREY COLEMAN, | ) | Civil Action No. 7:11cv00518 |
| Plaintiff, | ) | |
| v. | ) | MEMORANDUM OPINION |
| JOHN JABE et al., | ) | |
| Defendants. | ) | By: Samuel G. Wilson<br>United States District Judge |

Plaintiff Jeffrey Coleman, a Virginia inmate who claims to be a "sincere, practicing, Salafi Muslim," originally brought this *pro se* action pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc-1 *et seq.* ("RLUIPA"), against the Virginia Department of Corrections ("VDOC") and a group of VDOC employees for damages, injunctive relief, and declaratory relief to redress a long list of alleged wrongs related to Coleman's religious practices. The court referred the matter to United States Magistrate Judge Pamela Meade Sargent for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B), and she filed a report recommending that the court grant the defendants' motion for summary judgment on most of Coleman's claims. By earlier opinion and order, the court adopted essentially all of the Magistrate's Report and Recommendation, and dismissed or granted summary judgment on all of Coleman's claims except for his RLUIPA claims for injunctive and declaratory relief relating to four VDOC policies: a policy that establishes an official compact-disc vendor; a policy that establishes an official prayer-oil vendor; a policy that omits *halal* meat from VDOC's "Common Fare" diet; and a faith-review policy that resulted in VDOC's decision to group Salafi Muslims with Sunni Muslims for group worship. Coleman has filed a motion for summary judgment on his remaining claims, supplemented by a motion for

preliminary injunction, a motion for temporary restraining order, and a motion for appointment of counsel. The defendants responded to Coleman's summary judgment motion with a brief in opposition and a summary judgment motion of their own. The court now turns to Coleman's pending motions and remaining claims, denies his pending motions, and grants the defendants' motion for summary judgment on his remaining claims.

I.

Currently, VDOC recognizes forty religions, including Sunni Islam, Shiite Islam, the World Community of Islam, Buddhism, Odinism, Wicca, Santería, Rastafari, Quaker, and Baptist. For each recognized religion, VDOC accommodates the observance of holy days, facilitates congregational worship, provides access to religious programming and materials, and allows practitioners to possess religious paraphernalia. Because of these additional privileges, gangs and hate groups often petition for recognition as religious groups. To ensure that such groups do not attain official recognition, and to ensure that newly recognized groups are in fact distinct from previously recognized groups, VDOC's Faith Review Committee screens, and sometimes rejects, new applicants. For instance, the Faith Review Committee refuses to recognize the Ku Klux Klan as a religious group, and it does not differentiate between Catholics who practice different types of Mass or between Conservative and Orthodox Jews.

In 2009, Coleman asked the Faith Review Committee to recognize Salafi Muslims[1] as a distinct religious group. The Faith Review Committee researched Coleman's request and concluded that Salafi Islam is not a separate religion or denomination of Islam, but simply a school of thought within the Sunni branch of Islam. Because the Sunni Muslim group (which

---

[1] "Salafis are a Sunni group that advocates an especially strict form of Islam." *Belgium: Questions in Mosque Bombing*, N.Y. Times, March 15, 2012, at A10; see also U.S. Dep't of State, 108th Cong., *Annual Report on International Religious Freedom 2003*, at 542 (Comm. Print 2003) ("The [Saudi Arabian] Government follows the rigorously conservative and strict interpretation of the Salafi (often referred to as 'Wahhabi') school of the Sunni branch of Islam . . . .").

VDOC already recognized) would meet the needs of Salafi Muslims, VDOC notified Coleman that Salafi Muslims could interpret the Quran and other teachings as they saw fit while worshiping alongside the other Sunni Muslims.

Some of VDOC's operational policies have a more tangential impact on religious practice. For instance, VDOC has a policy that restricts where inmates may purchase compact discs. Under the policy as it was formerly written, inmates could purchase compact discs by mail from any vendor they wished. When compact discs arrived at the prison, VDOC employees inspected each disc to ensure that the packages were free from contraband and that the recorded material matched the labelling. But as compact discs became much more popular and technology enabled nearly anyone to make recordings on compact discs (even by recording over commercially produced compact discs) VDOC instituted a policy that limited inmates' compact-disc purchases to a single mail-order vendor.[2] By contracting with a single vendor who could ensure compliance with prison security procedures, VDOC saved time and money by mitigating the need to visually inspect and listen to every compact disc. When Coleman filed this action, VDOC's vendor was Jones Express Music ("JEM"), a small, Virginia-based mail-order music company. VDOC has since switched its vendor to a company called "Music By Mail."

VDOC's prayer-oil policy arises from similar institutional concerns. Under the policy, an inmate must purchase his prayer oil from Keefe Commissary. Keefe Commissary's prayer oil complies with VDOC specifications for nonflammability (reducing the chance of fires), viscosity (reducing the chance that a prisoner will use the oil to slip out of handcuffs or cause someone to fall), and smell (reducing the chance that someone will use the oil to mask the smell of drugs). And, by using a single vendor, VDOC gives that vendor a powerful incentive to control quality,

---

[2] However, if an inmate desires a particular compact disc that the vendor does not offer, the inmate can order the compact disc through his facility's chaplain or institutional management. Those compact discs are then available for checkout from the chaplain or from the library.

3

reducing the chance that contraband will be hidden in the oil or that someone will tamper with the oil itself. In doing so, VDOC is able to direct its resources to pursuits other than prayer-oil inspection.

Resource considerations likewise motivate VDOC's decision to omit *halal* meat from the VDOC menu. Under VDOC policy, Virginia correctional facilities serve the Common Fare diet to inmates who have special religious dietary needs. The Common Fare diet is designed to meet the nutritional and religious needs of all known religious groups, including Muslims and Jews. See, e.g., Acoolla v. Angelone, No. 7:01cv01008, 2006 WL 938731, at *4 (W.D. Va. Sept. 1, 2006); Engelke Aff. ECF No. 73-3. Prior to 2008, the Common Fare diet supplied participants with kosher meat three times a week. VDOC has since replaced those servings with hot, soy-protein-based entrees, which reduced the cost of the Common Fare diet from an average of $6.00 per offender, per day, to $3.10 per day (closer to the $2.00 cost of the regular inmate diet). The Common Fare diet also includes protein in the form of eggs, peanut butter, and tuna.

According to VDOC's Islamic consultants, the Common Fare diet meets Islamic dietary guidelines. Nevertheless, VDOC has explored the possibility of providing prisoners with *halal* meat. The first stumbling block was the absence of a vendor expressing interest in supplying *halal* meat. The second was cost. VDOC currently spends $0.72 per pound on ground turkey, while *halal* ground turkey would cost $3.55 per pound. VDOC chicken patties cost $3.09 per pound, while the *halal* equivalent would cost $5.25. Similarly, the price of chicken leg quarters would rise from $0.84 per pound to $4.50 per pound, and the price of turkey franks would rise from $0.91 per pound to $1.68 per pound. Other costs would also rise significantly. To satisfy the various religions for which it is meant, prison staff must store and prepare Common Fare ingredients in an area separate and apart from the normal prison fare. Because VDOC does not

cook meat to accompany the Common Fare diet (and instead provides tuna and hot soy-protein-based entrees), VDOC does not have separate grills, ovens, rotisseries, and storage areas for *halal* meat. Even if VDOC did have that equipment, adding *halal* meat to the Common Fare diet would likely require VDOC to create an entirely new religious diet to accommodate vegetarian religions.

## II.

Coleman has four remaining claims, all pursuant to RLUIPA: (1) a claim that VDOC's policy establishing an official prayer-oil vendor offends his religion; (2) a claim that VDOC's policy establishing an official compact-disc vendor offends his religion; (3) a claim that VDOC's decision to omit *halal* meat from the Common Fare diet offends his religion; and (4) a claim that VDOC's faith-review process, which resulted in VDOC's decision to group Salafi Muslims with other Sunni Muslims for group worship, offends his religion. After review, the court finds that VDOC's policies are the least restrictive means of furthering compelling governmental interests, and therefore grants the defendants' motion for summary judgment on each claim.[3]

RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution." 42 U.S.C. § 2000cc-1(a). The exception to that standard arises when the government can demonstrate that the imposition of a burden "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." Id.

"[P]rison security is a compelling state interest . . . ." Cutter v. Wilkinson, 544 U.S. 709, 725 n.13 (2005). Indeed, RLUIPA "must be applied 'with particular sensitivity to security concerns,'" because "'RLUIPA [is not meant] to elevate accommodation of religious

---

[3] Summary judgment is appropriate when "*there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.*" Fed. R. Civ. P. 56(a).

5

observances over an institution's need to maintain order and safety.'" Couch v. Jabe, 679 F.3d 197, 201 (4th Cir. 2012) (alteration in original) (quoting Cutter, 544 U.S. at 722). Prison cost control is also a compelling governmental interest. See, e.g., Baranowski v. Hart, 486 F.3d 112, 125 (5th Cir. 2007) (stating that a prison policy related to controlling prison costs involves a compelling governmental interest); Lovelace v. Lee, 472 F.3d 174, 190 (4th Cir. 2006) (noting that the prison must provide "an explanation for the policy's restrictions that takes into account any institutional need to . . . to control costs").

To show that a policy is the "least restrictive" means of furthering a compelling government interest, prison officials must demonstrate that they have "consider[ed] and reject[ed]" less restrictive alternatives to the challenged practice. See Couch, 679 F.3d at 203. When prison administrators explain their challenged policies, the court must give deference to those explanations. See id. at 204 ("That explanation, when it comes, will be afforded due deference." (quoting Lovelace, 472 F.3d at 190)); Lovelace, 472 F.3d at 182 ("We confirm emphatically that any substantive explanation offered by the prison must be viewed with due deference.").

### A.

Coleman has sworn to this court that he "sincerely believes" he cannot purchase prayer oil from Keefe Commissary because it "sells swine and idols and takes interest, all of which is illegal in Islam." Despite his word, commissary records indicate that Coleman has made numerous purchases from Keefe Commissary, including turkey sausage, "enchilada party mix," refried beans, coffee, cookies, pickles, peanut butter, popcorn, crackers, and corn chips. Confronted with this fact, Coleman now offers that his purchases are an indication of sin, and not of insincerity. However, the court need not grapple with Coleman's sincerity (or lack of thereof)

6

because VDOC has established that its single-vendor prayer-oil policy is the least restrictive means of furthering the compelling governmental interests of security and cost control.

In this case, VDOC's interests in security and cost control go hand-in-hand. The single-vendor prayer-oil policy furthers institutional security because Keefe Commissary is a large, reputable vendor with a strong financial incentive to ensure that the prayer oil it ships to VDOC is free of alcohol, drugs, and other contraband. Keefe Commissary's prayer oil is not useful for starting fires, causing people to slip and fall, facilitating handcuff escapes, or masking the smell of contraband. And the single-vendor policy allows VDOC to maintain its present security standards without the need to expend resources evaluating each new vendor and each new vendor's prayer oil to ensure compliance with VDOC specifications. Likewise, a contract with a single, reputable vendor gives the vendor a powerful incentive to control quality, and permits VDOC to devote its resources to concerns other than inspecting individual bottles of prayer oil for contraband.

VDOC has considered and, for two principal reasons, rejected the alternative of allowing additional vendors.[4] First, a disparate list of vendors would undermine security and increase expense by requiring VDOC to evaluate new types of prayer-oil for acceptable specifications, and new shipments for contraband. Second, the addition of even one additional vendor for a particular religious group would fling the door wide to inmates' choices of other vendors. It takes little imagination to conjure up RLUIPA and equal protection arguments that would force VDOC to allow inmates to purchase prayer oil—and all manner of other goods—from nearly any vendor an inmate happened to prefer, thereby entirely undermining VDOC's interests in security and cost control. Because VDOC's prayer-oil policy is the least restrictive means of furthering

---

[4] In fact, VDOC *attempted* the alternative—it recently discontinued a program that allowed practicing Wiccans to purchase special oil from an outside vendor.

VDOC's compelling interests, the court grants the defendants' motion for summary judgment on Coleman's prayer-oil claim.

**B.**

According to Coleman, his religion mandates that he listen to religious teachings "from the mouths of the people with knowledge," and the only way he can do so is by purchasing their speeches on compact discs. He claims that he cannot purchase compact discs from JEM, however, because JEM sells other materials that Islam prohibits. The defendants argue that VDOC's compact-disc policy does not substantially burden Coleman's religious exercise and is, in any event, the least restrictive means of furthering the compelling governmental interests of security and cost containment. While there appears to be a good foundation for those arguments, see, e.g., Shabazz v. Va. Dep't of Corrs., No. 3:10cv638, 2013 WL 1098102 (E.D. Va. March 15, 2013), the dispute is moot. According to the defendants' latest filings, JEM no longer supplies VDOC's compact-disc needs. Instead, Music By Mail supplies those needs. As with all cases presented for federal-court adjudication, "an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." White Tail Park, Inc. v. Stroube, 413 F.3d 451, 457 (4th Cir. 2005). There is no actual controversy and "a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Powell v. McCormack, 395 U.S. 486, 496 (1969). Because a new vendor supplies VDOC's compact-disc needs, Coleman's claim relating to JEM is no longer "live." Even if the controversy were viable, the court would grant the defendants' motion for summary judgment for reasons substantially similar to those underlying the court's prayer-oil holding. Regardless, the court dismisses Coleman's compact-disc claim as moot.

## C.

Coleman has sworn to this court that he must eat a *halal*-certified diet that includes *halal* meat slaughtered in the name of Allah. Here again, Coleman's conduct belies his claims. Commissary records indicate that Coleman often purchases food from Keefe Commissary that does not appear on VDOC's *halal*-approved list. In any event, the court finds that VDOC's decision to omit *halal* meat from the Common Fare diet is the least restrictive means of furthering the compelling governmental interest of cost control.

When VDOC considered the possibility of providing *halal* meat, it found that *halal* ground turkey would cost 393% more than ordinary ground turkey, *halal* chicken patties would cost 70% more, *halal* chicken leg quarters would cost 436% more, and *halal* turkey franks would cost 85% more. Adding *halal* meat to the Common Fare diet would cause other costs to rise significantly as well. Because VDOC does not cook meat to accompany the Common Fare diet (and instead serves tuna and hot soy-protein based entrees), VDOC would need to install new preparation and storage areas for *halal* meat. In addition, adding *halal* meat to the Common Fare diet would likely require VDOC to create an entirely new diet to accommodate vegetarian religions. Consequently, to control costs, VDOC rejected the possibility of providing *halal* meat. Because the policy is the least restrictive means of furthering the compelling governmental interest of cost control, the court grants the defendants' motion for summary judgment on Coleman's *halal* meat claim.

## D.

Coleman claims that as a Salafi Muslim, he cannot "sit with deviants" (*i.e.*, non-Salafi Muslims) during his group worship. Based on the Faith Review Committee's decision that Salafi Muslims could interpret the Quran and other teachings as they preferred while worshiping

alongside the other Sunni Muslims, Coleman has asked the "court to declare that [VDOC's religion] recognition policy violates RLUIPA," and to compel the defendants to recognize Salafi Islam as a distinct religion. The court finds, however, that the policy does not violate RLUIPA because it is the least restrictive means of furthering the compelling governmental interests of security and cost control.

VDOC created the Faith Review Committee because security and cost concerns preclude VDOC from rubber-stamping applications for religious recognition. In filtering out gangs and hate groups, the policy furthers institutional security by preventing such groups from circumventing the security-based bans on association and materials-possession that ordinarily encumber their activities. And by carefully screening applicants to determine whether an existing religious group adequately meets an applicant's needs, VDOC manages the costs and complications that accompany new worship groups. The alternative, of course, is rubber-stamp approval, which would further neither security nor cost control. By extension—and given the deference this court owes to prison administrators—the Faith Review Committee's conclusion that Salafi Muslims can worship alongside other Sunni Muslims passes RLUIPA muster. A contrary result would inevitably lead to an unmanageable multitude of officially recognized religions and worship groups (which RLUIPA does not contemplate) and would utterly vitiate the administrators' discretion (which RLUIPA-deference does not permit). Accordingly, the court grants the defendants' motion for summary judgment on Coleman's religious-recognition claim.[5]

---

[5] The concept of a "faith review committee" is an alien concept in tension with core First Amendment principles, but perhaps also an inevitable byproduct of the requirements RLUIPA imposes on prison administrators. See supra Part I (discussing the numerous religions VDOC recognizes and the particularized accommodations VDOC offers each religion). While the Fourth Circuit Court of Appeals has upheld RLUIPA against facial Establishment Clause challenges, see Madison v. Riter, 355 F.3d 310 (4th Cir. 2003), this case offers a stark example of how RLUIPA, as applied, fosters government entanglement with religion. Cf. Lovelace, 472 F.3d at 216 (noting that RLUIPA can create "unnecessary tensions between the Free Exercise and Establishment Clauses")

## III.

For the reasons stated, the court grants the defendants' motion for summary judgment, and denies Coleman's motion for summary judgment, motions for injunctive relief, and motion for appointment of counsel.

**ENTER:** August 13, 2013.

_____
UNITED STATES DISTRICT JUDGE

---

(Wilkinson, J., concurring in the judgment in part and dissenting in part); id. ("Whether or not the result posited by the majority would lead to an Establishment Clause violation in fact, it would surely generate difficult constitutional questions. At a minimum, the RLUIPA envisioned by the majority will lead to claims of discrimination among faiths. For example, prison administrators forced to provide specially tailored hearings and procedures risk the appearance of impermissibly 'singl[ing] out [] particular religious sect[s] for special treatment.'" (alteration in original) (citation omitted) (quoting Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet, 512 U.S. 687, 706 (1994))).