CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAY 16 2014

JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| JEFFREY COLEMAN, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 7:11cv518 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| JOHN JABE, et al., | ) | By: Samuel G. Wilson |
| | ) | United States District Judge |
| | ) | |
| Defendants. | ) | |

Plaintiff Jeffrey Coleman, a Virginia inmate who claims to be a "sincere, practicing, Salafi Muslim," originally brought this *pro se* action pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc–1 *et seq.* ("RLUIPA"), against the Virginia Department of Corrections ("VDOC") and a group of VDOC employees for damages and injunctive and declaratory relief to redress a long list of alleged wrongs related to Coleman's religious practices. The court referred the matter to United States Magistrate Judge Pamela Meade Sargent for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B), and she filed a report recommending that the court grant the defendants' motion for summary judgment on most of Coleman's claims. Coleman v. Jabe, 2012 WL 7801722 (W.D. Va. Dec. 26, 2012). The court adopted essentially all of the Magistrate's Report and Recommendation and dismissed or granted summary judgment on all of Coleman's claims except for his RLUIPA claims for injunctive and declaratory relief relating to four VDOC policies. Coleman v. Jabe, 2013 WL 1209014 (W.D. Va. Mar. 25, 2013). Later, the court granted the defendants' motion for summary judgment on those remaining claims. Coleman v. Jabe, 2013 WL 4084762 (W.D. Va. Aug. 13, 2013). Nearly a month later, but within the time permitted by Rule 59(e) of the Federal Rules of Civil Procedure, Coleman moved for

1

reconsideration of most of the court's rulings. For the most part, he made arguments the court already rejected or arguments that are frivolous. The court found it appropriate, however, to reconsider his claims that the VDOC single vendor and grooming policies violated his rights under RLUIPA and held an evidentiary hearing to address them. The court now concludes that the defendants have shown the policies are the least restrictive means of furthering a compelling government interest and enters judgment for the defendants.

I.

A.

The VDOC has a single vendor policy (Operating Procedure "OP" 802.1) that restricts an inmate's ability to purchase personal property from an outside vendor. The VDOC formerly had a multiple vendor policy, but according to David Robinson, Chief of Corrections Operations, "it was a nightmare." (Hr'g Tr. 54:5-7) The VDOC had numerous incidents where products were shipped to the facility that did not comply with VDOC specifications, presenting security and safety risks. (Hr'g Tr. 54:5-55:3; see Cei Aff. at ¶ 8, ECF No. 73-1 at 3) As a result, the VDOC contracted with Keefe Commissary ("Keefe") for it to provide all property sold by the prison in its general store, including various food, personal hygiene, and religious items. Under OP 802.1, an inmate must purchase all personal property through the prison's general store and therefore all property through Keefe. If Keefe does not provide a product, the VDOC directs inmates and prison administrators to notify Keefe to determine if it can obtain and provide the item. (Hr'g Tr. 48:23-49:7; 59:6-15) If Keefe cannot provide the item, under limited circumstances, prison administrators may grant an exception allowing an inmate to order it from an approved mail order vendor. OP 802.1.

2

Keefe provides prayer oils for purchase, including a Middle Eastern prayer oil (Frankincense) used by Muslims. (See ECF No. 73-2 at 4) Keefe did not originally provide a certain type of oil used by Wiccan and Native American inmates. (See Hr'g Tr. 53:12-21) Consequently, Wiccan and Native American inmates requested exceptions to OP 802.1 so they could purchase their prayer oils from an outside vendor. Rather than first inquiring whether Keefe could obtain and supply their oils, certain prison administrators liberally granted exceptions to Wiccan and Native American inmates. (See Hr'g Tr. 48:10-22; 59:6-15)

Coleman, who professes to be a sincere, practicing Salafi Muslim, became aware of this practice. Coleman claims that his religious beliefs forbid him from purchasing his prayer oil from Keefe because Keefe sells other products forbidden by Islam (such as swine products) and collects interest.[1] Although Keefe provides his prayer oil, Coleman requested an exception so that he could order it from a different provider (a mail order vendor of his choice). Prison personnel denied his numerous requests, and Coleman filed grievances, which they also denied.

Because prison administrators allowed Wiccan and Native American inmates to order different types of oil from multiple outside vendors to meet their needs, demand for oils not carried by Keefe increased,[2] causing security concerns.[3] (Robinson Aff. at ¶ 8, ECF No. 92-1; see Hr'g Tr. 59:11-22) Prayer oil must comply with VDOC specifications, including flammability rating (reducing the chance of fires), viscosity (reducing the chance that a prisoner

---

[1] Notwithstanding these convictions, Coleman has regularly purchased other personal property from Keefe with no complaint. (See ECF No. 73-2) (listing the purchase of enchilada party mix, refried beans, coffee, cookies, pickles, peanut butter, popcorn, crackers, and corn chips).

[2] For example, even Coleman was able to join the list of practicing Wiccans and order Wiccan oil.

[3] Inmate Brandon Grimm provides a telling account. According to him, he ordered his Wiccan oil from Azure Green but eventually discovered that other Wiccan inmates had been permitted to order from another vendor, Garden of Fragrances, *which provides hundreds of more types of oil than Azure Green.* (Grimm Aff. at ¶¶ 4-5; ECF No. 79-2 at 1-2)

3

will use the oil to slip out of handcuffs or cause someone to fall), smell (reducing the chance that someone will use the oil to mask the smell of drugs), and packaging (reducing the likelihood that the bottle contains contraband). (See Hr'g Tr. 55:17-56:11) It must also be non-alcoholic. Each time the VDOC grants an exception allowing a new vendor or new type of oil, prison personnel must perform a background check on the vendor and send the oil to a laboratory for testing, increasing time and costs. (Walz Aff. at ¶ 4; Hr'g Tr. 55:4-16) As the number of vendors and oils increases, so too does the difficulty in ensuring compliance with VDOC specifications. (Id., ECF No. 73-2 at 1-2) As a result, according David Robinson, the VDOC eventually decided that Keefe should eliminate the need for any prayer oil exceptions by having Keefe provide *all* such oils, including Wiccan and Native American oils. (Hr'g Tr. 56:25-59:22) ("Wardens were starting to manage to the exception . . . and we know we don't do well at that . . . it becomes a can of worms that you can't manage."); (see Robinson Aff. at ¶ 8).[4]

B.

The VDOC also restricts an inmate's ability to grow facial hair. Coleman states that his religious faith requires him to grow a "fist long" beard but otherwise requests in this lawsuit the right to grow a one-half inch beard.[5] (Hr'g Tr. 25:22-26:10) When Coleman filed this lawsuit, the VDOC did not allow inmates to grow beards absent a medical exception. The VDOC changed its policy and now allows inmates to grow beards but restricts their length to one-

---

[4] At the evidentiary hearing, Robinson, testified that all prison commissaries carry Wiccan prayer oils, but some commissaries have been slower than others at stocking Native American prayer oils. Therefore, at those institutions, some exceptions have recently been granted. The VDOC is currently taking action, however, to eliminate this discrepancy and has directed prison administration to no longer grant exceptions for the purchase of prayer oils from outside mail order vendors. (Robinson Aff. at ¶ 7, ECF No. 92-1 at 2-3)

[5] Coleman testified that he really wants a fist length beard, and if the court grants him a half-inch beard, he would likely argue that a half-inch beard is not the least restrictive means of furthering a compelling government interest. (See Hr'g Tr. 18:14-19)

4

quarter inch. OP 864.1. Before implementing this change, the VDOC discussed and considered numerous lengths, including one-eighth and one-half inch lengths, but ultimately determined that a one-quarter length was most appropriate in promoting the prison's security and health concerns. David Robinson testified that at one-quarter inch in length: prison personnel may still identify scars, tattoos, and other special markings; an inmate cannot as easily change his appearance for an escape attempt; there is less risk the beard will become unsanitary or otherwise infested with lice and the like; and it is less likely that the prisoner will be able to conceal drugs and small razor blades, which may be used to self-mutilate or harm others. (Hr'g Tr. 36:22-39:22) Coleman does not dispute that these are valid concerns. (Hr'g Tr. 26:11-28:1) ("I understand that you're asking me the longer the beard is, the more your concern is, and, yeah, I agree with that . . . and, actually, you make me safer by enforcing that policy. So I don't have an objection to you making me keep it to where people can't hide knives in it, because I mean, that's going to keep me safer.")

II.

Coleman claims that he should be able to order his prayer oil from a vendor of his choice and that the single vendor policy prevents him from doing so in violation of RLUIPA. The defendants argue that the policy does not substantially burden Coleman's religious beliefs and, in any event, represents the least restrictive means of furthering compelling government interests. Assuming without deciding that Coleman's beliefs have been substantially burdened, the court finds that the single vendor policy is the least restrictive means of furthering compelling government interests.

Congress enacted RLUIPA in 2000 "because it found that some prisons [had] restricted liberty 'in egregious and unnecessary ways'" unrelated to any legitimate reasons. Lovelace v.

Lee, 472 F.3d 174, 182 (4th Cir. 2006) (citing 146 Cong. Rec. S7775 (July 27, 2000) (joint statement of Sen. Hatch and Sen. Kennedy). RLUIPA prohibits the government from imposing "a substantial burden on the religious exercise" of an inmate unless the government can demonstrate that the burden "(1) is in furtherance of a compelling government interest; and (2) is the least restrictive means of furthering that compelling government interest." 42 U.S.C. § 2000cc-1(a). The plaintiff bears the initial burden of establishing that the government's actions substantially burden a sincerely held religious belief. A substantial burden occurs when a state or local government "puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." Lovelace v. Lee, 472 F.3d 174, 187 (4th Cir. 2006) (quoting Thomas v. Review Bd. of Ind. Employment Sec. Div., 450 U.S. 707, 718 (1981)). The court assumes without deciding that Coleman has met his burden here.[6]

Once the plaintiff demonstrates that a government practice substantially burdens his or her exercise of religion, the burden shifts to the defendant to show that the government practice or policy is the "least restrictive means of furthering a compelling government interest." Id. at 189. Prison safety and security are compelling government interests, Cutter v. Wilkinson, 544 U.S. 709, 725 n.13 (2005), as is cost control. Baranowski v. Hart, 486 F.3d 112, 125 (5th Cir. 2007). To show that a policy is "the least restrictive means" of furthering a compelling government interest, prison officials must demonstrate that they have "consider[ed] and reject[ed]" less restrictive alternatives to the challenged practice. Couch v. Jabe, 679 F.3d 197,

---

[6] Though the court assumes without deciding that Coleman's sincerely held religious beliefs have been substantially burdened, there is reason to question the sincerity of his beliefs in light of his conduct. For instance, he says his religious exercise prohibits him from supporting Keefe; yet, the defendants produced evidence showing that Coleman purchases items from Keefe every month and sometimes multiple times each month. (See ECF No. 73-2 at 4-15); see also Jehovah v. Clarke, 2013 WL 4498678, at *4 (E.D. Va. Aug. 20, 2013) (finding that mere religious preferences are not entitled to protection under RLUIPA).

6

203 (4th Cir. 2012). When prison administrators explain their challenged policies, the court must give deference to those explanations. See Lovelace, 472 F.3d at 182. And courts should view explanations based on security with "particular sensitivity." Lovelace, 472 F.3d at 190. The RLUIPA is not meant to "elevate accommodation of religious observances over an institution's need to maintain order and safety." Cutter, 544 U.S. at 722.

In this case, the VDOC has established that its single vendor policy is the least restrictive means of furthering compelling government interests. By using a single vendor, the VDOC is able to offer products for sale to its inmates without unduly compromising important security and safety interests. David Robinson testified that the VDOC tried a multiple vendor policy, but there were numerous incidents where vendors shipped problematic products. By switching to a single vendor, the VDOC substantially lessened its compliance monitoring burden. Because of strong financial incentives, the VDOC is able to rely on Keefe to comply with its product requirements (preventing contraband from entering its facilities). Consequently, the VDOC saves additional time and resources it would otherwise have to expend evaluating each new vendor and product shipment.

Coleman nonetheless contends that the VDOC has demonstrated it can grant prayer oil exceptions; therefore, the policy is not the least restrictive means of furthering the compelling government interests. However, the VDOC has shown exactly the opposite—that allowing prayer oil exceptions compromised its interests. Prison personnel initially granted exceptions to Wiccan and Native American inmates because Keefe did not carry their prayer oil.[7] The exceptions posed a limited, manageable burden, as the number of Wiccan and Native American inmates seeking such oils was relatively small. But that quickly changed. More and more

---

[7] There is no evidence that the prison personnel granted or refused exceptions due to any discriminatory motive.

7

inmates sought exceptions, including some that inaccurately represented that they were Wiccan or Native American, and they sought hundreds of different types of oils from multiple vendors, burdening limited VDOC resources. "[A]n accommodation must be measured so that it does not override other significant interests." Cutter, 544 U.S. at 722. In this case, the prayer oil exception threatened to do just that, and thus, the VDOC chose to eliminate it. Accordingly, because the single vendor policy is the least restrictive means of furthering the compelling government interests of safety, security, and cost control, the court rejects Coleman's claim.

III.

Coleman also claims that the VDOC's grooming policy violates his rights under RLUIPA because although he is permitted to grow a one-quarter inch beard, his religious beliefs require him to grow a longer beard.[8] Applying the deferential standard, the court finds that the defendants have shown the grooming policy to be the least restrictive means of furthering their interests in safety and health.

Coleman does not dispute that the VDOC has compelling interests in safety and health to restrict the length of beards. He simply argues that the quarter-inch limit is not the least restrictive means of furthering those interests because inmates at some other prison facilities are allowed to grow longer, half-inch beards. Although prison policies from other jurisdictions may provide some evidence as to feasibility of implementing less restrictive means of achieving prison safety and security, Hamilton v. Schriro, 74 F.3d 1545, 1556 (8th Cir. 1996), they "do not outweigh [the] deference owed to expert judgment of prison officials who are more familiar with

---

[8] The court originally found that when the VDOC instituted a new policy allowing inmates to grow beards, it essentially gave Coleman what he sought, mooting his claim to injunctive relief. Coleman claims it was not moot because he requested a half-inch beard, and the VDOC policy only permits that inmates may grow a quarter-inch beard. On reconsideration, the court considers *only* whether the VDOC violates *RLUIPA* by limiting beards to one-quarter inch in length.

8

their own institutions." Holt v. Hobbs, 509 Fed. App'x 561, 562 (8th Cir. 2013). "[A]bsent substantial evidence in [the] record indicating that [the] response of prison officials to security concerns is exaggerated, courts should ordinarily defer to their expert judgment in such matters." Id. (citing Fegans v. Norris, 537 F.3d 897, 903 (8th Cir. 2008)); see Lovelace, 472 F.3d at 182, 190 (stating "emphatically that any substantive explanation offered by the prison *must be* viewed with due deference"). There is no such evidence here. David Robinson adequately explained that the VDOC considered alternative lengths, such as a half-inch beard, but ultimately concluded that longer beard lengths made identification of its inmates more difficult and created plausible safety and sanitation concerns. Accordingly, because the VDOC has demonstrated compelling government interests for a quarter-inch length beard and has sufficiently explained how its policies further those interests, the court rejects Coleman's claim.[9]

---

[9] David Robinson testified that the VDOC in fact accommodates prisoners who must grow longer hair for religious purposes. Such inmates must reside in the 864 pod at Wallens Ridge State Prison. (H'rg Tr. 41:12-43:5; 63:10-18) Though they argue that this fact by itself is sufficient to defeat Coleman's claim, the court need not address it.

IV.

For the reasons stated, after reconsideration, the court rejects Coleman's claims that the VDOC single vendor and grooming policies violate his rights under RLUIPA and enters judgment for the defendants.[10]

**ENTER:** May 16, 2014.

UNITED STATES DISTRICT JUDGE

---

[10] Coleman has requested an additional hearing in which he seeks to again raise claims previously decided and claims the court chose not to reconsider. The court denies his motion (ECF No. 126).